Commonwealth *v.* Compel, Appellant.

Argued November 13, 1974. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

406

Thomas D. MacMullan, with him Brandt, McManus, Brandt & Malone, for appellant.

Robert L. Eberhardt, Assistant District Attorney, with him John M. Tighe, First Assistant District Attorney, and John J. Hickton, District Attorney, for Commonwealth, appellee.

OPINION BY SPAETH, J., September 22, 1975:

Appellant was convicted by a judge sitting without a jury of burglary, larceny and receiving stolen goods. The conviction arose from the fact that on the evening of November 9, 1971, appellant took four horses from the Valleybrook Stables in South Park Township, Allegheny County. Appellant admits he took the horses; however, he contends he did not steal them because he reasonably believed the horses were his.

" 'Larceny may be defined to be the fraudulent taking and carrying away of a thing without claim of right, with the intention of converting it to a use other than that of the owner, without his consent': 2 Wharton's Criminal Law, Sec. 1097. . . . It has been repeatedly held that when one takes property under a claim of right, even though mistaken, larceny is not committed: Com. v. Wilson, 266 Pa. 236, 109 A. 913; Com. v. Swayne, 1 Pa. Superior Ct. 547; 2 Wharton's Criminal Law, Sec. 1123." Thomas v. Kessler, 334 Pa. 7, 9, 5 A.2d 187, 188 (1939).

"A bona fide, reasonable mistake of fact will negative [the] criminal intent" necessary for conviction of larceny. *Commonwealth v. Meinhart,* 173 Pa. Superior Ct. 495, 500, 98 A.2d 392, 395 (1953). *See also Commonwealth v. English,* 446 Pa. 161, 279 A.2d 4 (1971). It is not necessary that the facts be as the actor believed them to be; it is only necessary that he have "a bona fide and reasonable belief in the existence of facts which, if they did exist, would render an act innocent." *Commonwealth v. Lefever,* 151 Pa. Superior Ct. 351, 353-54, 30 A.2d 364, 365 (1943). *See generally, Morissette v. United States,* 342 U.S. 246 (1952).

Accordingly, if appellant did reasonably believe the horses were his, he did not commit larceny; nor did he commit burglary, when he entered the stables with intent to take the horses; nor did he receive any stolen goods. The question, therefore, is, what does the evidence show regarding appellant's state of mind?

On June 6, 1971, appellant arranged to board his four horses with Nicholas Lake, trading as Valleybrook Stables in South Park Township, Allegheny County. The horses were a registered stallion, two brood mares, and a three-week old colt. On July 21, 1971, appellant paid Lake $159.00 in board.[1] In late September, appellant brought a fifth horse, a four-month old filly, to board at the stables. Appellant visited his horses in the evening, after he finished his work as a teacher during the day. He fed the filly and the colt exclusively with his own feed and supplemented the feeding of the older horses. He frequently permitted others to ride his horses. Approximately a week after boarding the filly, he was informed by a woman who frequented the stables that his colt was ill. Appellant called a veterinarian, who diagnosed the illness as lead

---

1. Lake testified that this was board for June only; appellant testified that it was for June and July. Both agreed that no board was paid for August, September, or October.

paint poisoning caused by Lake's use of water buckets formerly used by the County to hold lead-based paint. The veterinarian ordered injections for the colt twice daily. Appellant administered one injection when he visited the stable in the evening; he relied on Lake and his staff to give the daytime injection.[2] Nevertheless, the colt deteriorated and either in late September or during October (the record is unclear) had to be destroyed. On the advice of counsel, in January, 1972, appellant filed a civil suit against Lake for compensation for the loss of the colt, alleging that the loss was due to Lake's negligence in using paint buckets to water the colt.

Lake testified that on October 17, 1971, in the presence of a witness (who was not called to testify), he told appellant that he was $845.00 in arrears in his board, and that on October 18, in the presence of another witness (who did not testify), he gave appellant a written statement of the arrearages and posted on the bulletin board in a passageway near the front door of the stables and in the stables office a notice of a public auction of the horses to be held on November 2, 1971, in satisfaction of his livery stable keeper's lien.[3] Mrs. Lake testified that the

---

2.  Appellant contends that neither Lake nor any member of his staff administered the daytime injections.

3.  This was pursuant to Act of April 7, 1807, P.L. 162, 4 Sm.L. 403, §1, 37 P.S. §81: "From and after the passing of this act, all livery stable keepers and innkeepers within this commonwealth shall have a lien upon any and every horse delivered to them to be kept in their stables, for the expense of the keeping; and in case the owner of the said horse or horses, or the person who delivered them for keeping to the keeper of the livery stable or innkeepers, shall not pay and discharge the said expense, provided it amount to thirty dollars, within fifteen days after demand made of him personally, or in case of his removal from the place where such livery stable or inn is kept, within ten days after notice of the amount due, and demand of payment in writing left at his last place of abode, the livery stable keeper or innkeeper may cause the horse or horses aforesaid, to be sold at public sale according

notice was merely posted; it was not published in a newspaper or given to appellant or mailed to his address. The auction was held but no one attended it except Lake, who thereupon assumed ownership of the horses in satisfaction of his lien, and noted this fact on the two notices of the auction.

Appellant took the horses during the evening of November 9. He testified that he had gone to his attorney, who advised him "to quietly remove my horses from the stable." Regarding his conversation with Lake, appellant testified that after the death of his colt he "told Mr. Lake, after he had told me that the board was due, that I didn't intend to pay it because I wanted some compensation made for my colt." Appellant admitted that Lake had given him a written statement of board due, but he said that the only threat by Lake was that he would remove the horses from the stable and tie them to the fence outside. Appellant insisted he know nothing of the auction. His testimony continued:

"Q. [by Mr. Wagner, counsel for appellant] To whom did you think the horses belonged to at the time you took them?

A. The horses belonged to me. In fact, the one I had owned for going on eight years. . . .

Q. You say you saw no notice or no friends of yours saw a notice indicating there was going to be a sale of the horses?

A. No.

Q. Did you ever see a notice after the sale date?

---

to law, and after deducting from the amount of sales the costs of sale and the expense of keeping, shall deliver the residue upon demand to the person or the agent of the person who delivered the horse or horses to him for keeping: Provided always, That nothing in this act contained shall be construed to impair any right of action which the said livery stable keepers or innkeepers may have against any person or persons, for the keeping his or their horse or horses."

A. No. I didn't.

Q. To this day, you have never seen a notice?

A. No, I didn't.

Q. Any of your friends?

A. No, they haven't."

On cross-examination, appellant testified:

"Q. [by Mr. Foster, Assistant District Attorney] Mr. Compel, were you aware of the fact, prior to the taking of the horses, that Mr. Lake had perfected title by placing a lien on those horses?

A. No. I wasn't.

Q. All right now, did Mr. Lake verbally inform you that he intended to place a lien on those horses?

A. Yes, he did.

Q. And did he hand you a copy of that legal document?

A. No, he didn't.

Q. Did he read it to you?

A. No, he didn't.

Q. But you were aware of the fact that he had perfected a lien prior to your taking the horses; is that correct?

A. No. All I know was he said that if my board wasn't paid soon, that he was going to take some action and that's when he told me the horses would be tied outside to the fence."

From this conflicting testimony the trial judge made a finding of fact that the evidence proved beyond a reasonable doubt that when appellant took the horses, he knew they were not his. In reviewing this finding on appeal, we must regard the evidence in the light most favorable to the Commonwealth, giving it the benefit of all reasonable inferences. *Commonwealth v. Minor*, 227 Pa. Superior Ct. 343, 345, 322 A.2d 717 (1974); *Commonwealth v. Herman*, 227 Pa. Superior Ct. 326, 329, 323 A.2d 228 (1974). Even so regarding the evidence, however, we find it insufficient.

As there was no direct evidence that appellant had knowledge of the change of ownership of the horses, such knowledge had to be inferred from evidence of the surrounding circumstances. *Commonwealth v. Whitman,* 199 Pa. Superior Ct. 631, 186 A.2d 632 (1962). Unlike the statement of arrearages which was presented to appellant personally, the notice of the impending auction was merely posted for fifteen days in the stables. It may be that appellant saw the notice, but it is at least equally possible that he was telling the truth when he testified that he did not. (It is significant that Lake never testified that he told appellant of the auction—only of the arrearages.) There is no evidence that appellant used the passageway or was in the office, the two places where Lake said the notice was posted. Appellant testified he usually used the back door, because his practice was to come to the stables "late at night and the back door was always open." Nothing in the record suggests that either of the posted notices was visible to someone using the back door. Lake testified that the stables are located in the center of a park and have "a lot of pedestrian traffic in the sense that many people come to see horses, bring their children there. There are people who train horses there at the track for sulky racing. There are people who ride horses there for pleasure." The horses in question were registered horses used for breeding and for show. It is reasonable to assume that some of the frequent visitors to the stables might have found them attractive enough to attend the auction, if they knew about it. However, none of them did. If others did not learn of the auction from the notices, it is certainly possible that appellant did not.

The situation presented here is analogous to that often presented in cases involving charges of receiving stolen goods or possession of narcotics. For example, in *Commonwealth v. Simmons,* 233 Pa. Superior Ct. 547, 336 A.2d 624 (1975), we held that evidence of mere

possession of stolen goods is not sufficient to convict someone of the crime of receiving stolen goods. Other circumstances must be shown to allow an inference that the person knew the goods were stolen. And in *Commonwealth v. Fortune*, 456 Pa. 365, 318 A.2d 327 (1974), the Supreme Court held that knowledge of the presence of narcotics in a house cannot be inferred from the fact of residence in the house. Again, other circumstances must be shown. So here, proof of mere posting of notices was insufficient to show knowledge that the auction had been held and ownership of the horses assumed by Lake.

It is true that appellant took the horses at night. However, as has been mentioned, appellant explained that during the day he worked as a teacher. Moreover, he did not act covertly. Thus he testified on cross-examination that

> "I had a hauler come down with a truck and we drove up to the front of the barn. I walked around to the back of the barn, the door was always unlocked.
>
> "I went through, opened the front door, and then I went to the stalls and removed each horse, one at a time, and we loaded them on the truck in front of the stable, which is well located across the street from the police barracks."

Also, appellant readily admitted his participation in the alleged theft to Sergeant Donald A. DeGenther of the County Police force and later to a police lieutenant. While, to be sure, many a thief confesses, this action by appellant is consistent with his position that he believed he had done nothing wrong and therefore had nothing to hide or to fear. *Accord, Morissette v. United States, supra.*

The conviction of larceny, and the convictions of burglary and receiving stolen goods, which were based on the larceny conviction, are reversed, and appellant is discharged.

PRICE, J., did not participate in the consideration or decision of this case.