252 Pa. Superior Ct. 539 (1977)
382 A.2d 473
APARTMENT OWNERS AND MANAGERS COMMITTEE OF the STATE COLLEGE AREA CHAMBER OF COMMERCE, by Harold Zipser, Chairman, Trustee Ad Litem, Garden House Realty Co., I & A Corporation, Atlas Realty Co., Inc. and Marie Capparelli, t/d/b/a Casa DiAltaomonte Restaurant, Appellants,
v.
Charles C. BROWN, Officially as District Attorney of Centre County, Pennsylvania.
Henry F. GNAS
v.
NATALIE'S TOWING SERVICE, INC., Appellant.
Superior Court of Pennsylvania.
Argued September 14, 1976.
Decided December 28, 1977.
*542 Benjamin Novak, State College, with him Novak & Donovan, State College, for appellants.
Charles C. Brown, Jr., appellee, in propria persona.
John W. Blasko, State College, for appellee, Henry F. Gnas.
Before WATKINS, President Judge and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.
PRICE, Judge:
Two cases which were consolidated in the lower court are before us on appeal. The appeal in No. 977 is from the order of the lower court dismissing the appellants' petition for declaratory relief. The appeal in No. 978 is from the order of the lower court requiring the appellant to pay $25.30 plus interest to appellee. We affirm the orders of the lower court in No. 977 and in No. 978.
The issue at the heart of these appeals is whether one who removes an illegally parked vehicle from his land has a possessory lien on the vehicle for the costs of towing and storage. The facts underlying the appeals are as follows: Prior to 1973, many owners of private property in State College, Pennsylvania, were seriously hindered in the use of their land by trespassers who illegally parked their motor vehicles on private property. The problem was particularly acute on weekends when the Pennsylvania State University football team played in State College. Owners and tenants of apartment buildings often discovered that unauthorized vehicles occupied spaces in their private parking facilities.[1] *543 Furthermore, all attempts to remedy the situation, such as posting warning signs or issuing citations, had been of little or no avail.
In 1973, several of the property owners proposed to Emanuel Natalie that he begin a towing service to remove illegally parked vehicles. Natalie formed appellant Natalie's Towing Service, Inc. [Natalie's]. The corporation purchased two towing trucks, other miscellaneous towing equipment, and a lot near the center of State College to be used as a pound. It then contracted with the owners of private parking lots to patrol their lots and to remove vehicles which were parked without permission. Natalie's also responded to individual calls from property owners to remove specific vehicles.
The procedure employed by Natalie's involved towing the vehicles to its pound, where they could be reclaimed by their owners. At least two attendants were on duty at the pound at all times. However, before Natalie's would release a vehicle to its owner, the owner was required to pay a fee.[2]
On October 10, 1973, appellee Henry F. Gnas, Jr., travelled from Beaver, Pennsylvania to State College to observe the football game being played that day. After the game, he and his friends repaired to the Tavern Restaurant on College Avenue. Mr. Gnas had been in State College on only one other occasion, and he was not particularly familiar with the area.
En route to the restaurant, Mr. Gnas bypassed opportunities to park in a large metered parking lot and in a four story parking garage. Instead, he parked in an unattended, unmetered, single-level lot which entered from an alley near the restaurant. The lot was enclosed on three sides by wooden logs. Mr. Gnas testified that he saw no signs prohibiting unauthorized parking.
*544 Mr. Gnas and his friends entered the restaurant and began to await an available table. After approximately one hour, he observed a sign inside the restaurant cautioning patrons not to park on private property. Mr. Gnas left the restaurant to check on his vehicle, only to discover that it had already been towed away by Natalie's.
Mr. Gnas dispatched his brother to obtain the car from the pound, which was located four blocks away. His brother paid the $25.30 fee, and the car was released.
On December 11, 1973, Mr. Gnas caused a writ of summons in assumpsit to be served on Natalie's. A complaint requesting judgment in the amount of $25.30 was filed on January 31, 1975. This is the appeal at No. 978.
In January, 1974, at a meeting of the Apartment Owners and Managers Committee of the State College Area Chamber of Commerce, Centre County District Attorney Charles C. Brown opined that one who tows an illegally parked vehicle from private property and refuses to relinquish it until a fee is paid is guilty of theft. He also stated that if any owner of a vehicle that had been towed filed a proper complaint with his office, he would prosecute the offender. Thereafter, Natalie's discontinued its towing service.
On July 19, 1974, the Apartment Owners and Managers Committee of the State College Area Chamber of Commerce, and several other individuals and corporations, filed a petition for declaratory relief pursuant to the Uniform Declaratory Judgments Act, Act of June 18, 1923, P.L. 840, § 1 (12 P.S. § 831) et seq., naming District Attorney Charles C. Brown as respondent. The petitioners sought a declaration of their civil rights and criminal liabilities under the facts as described above.
The action for a declaratory judgment and the action brought by Mr. Gnas against Natalie's were consolidated, and trial took place on February 26, 1975. In the action for a declaratory judgment, a stipulation of facts and issues was prepared and submitted to the court. This is the appeal at No. 977.
*545 On September 19, 1975, the lower court entered an order directing Natalie's to "refund and pay over" to Mr. Gnas the sum of $25.30 plus interest and dismissing the petition for declaratory relief. In its memorandum accompanying the order, the lower court explained that Natalie's did not have a possessory lien on the vehicle. Furthermore, the petition for a declaratory judgment was dismissed because the court declined to render an "advisory opinion as to a non-existent case," a function without the purview of the Uniform Declaratory Judgments Act.
Natalie's contends that the lower court erred in determining that no lien exists in this case. Three theoretical bases for the existence of a lien are suggested. First, Natalie's argues that it has a common law or artisan's lien. A common law lien is the right of one who by labor, skill, or materials adds value to the chattel of another, whether under an express or implied agreement with the owner, to retain possession of the chattel until the owner has paid for the value of his services. R. Brown, The Law of Personal Property § 107 (2d ed. 1955). In Pennsylvania, a garageman has the right to assert a possessory lien for an automobile which he has stored or repaired at the request of the owner. Saxton v. Gemehl, 72 Pa.Super. 177 (1919).
The common law lien arises by implication from the express or implied contractual relation that exists between the workman and the owner. See 51 Am.Jur.2d, Liens § 21 (1966). Thus, it is well settled that a common law lien does not attach when the goods have been brought to the workman without the express or implied consent of the owner. Welded Tube Co. v. Phoenix Steel Corp., 377 F.Supp. 74 (E.D.Pa. 1974), aff'd and remanded, 512 F.2d 342 (3d Cir. 1975) (interpreting Pennsylvania law); Leitch v. Sanford Motor Truck Co., 279 Pa. 160, 123 A. 658 (1924); Midland Credit Co. v. White, 175 Pa.Super. 314, 104 A.2d 350 (1954); Wilson v. Malenock, 128 Pa.Super. 544, 194 A. 508 (1937); Automobile Finance Co. v. Markman, 82 Pa.Super. 478 (1924); Bankers' Commercial Security Co. v. Brennan, 75 Pa.Super. 199 (1920); R. Brown, supra, § 111; Annot., 48 A.L.R.2d 894 (1956).
*546 Our supreme court in Meyers v. Bratespiece, 174 Pa. 119, 121, 34 A. 551, 551 (1896), propounded the most often cited language on the subject when the following appeared in that opinion:
"`Whenever a workman or artisan, by his labor or skill, increases the value of personal property placed in his possession to be improved, he has a lien upon it for his proper charges until paid,' but `in order to charge a chattel with this lien the labor for which the lien is claimed must have been done at the request of the owner, or under circumstances from which his assent can be reasonably implied. It does not extend to one not in privity with the owner.' 13 Am. & Eng.Enc. of Law, pp. 590, 591; Clark v. Hale, 34 Conn. 398; and Hollingsworth v. Dow, 19 Pick. 228."
From at least that time to the present, Pennsylvania courts have consistently held the consensual quality of the transaction which gives rise to possessory liens at early common law to be an indispensable element of the common law possessory lien.
We must therefore conclude, as recently the Federal District Court for the Eastern District of Pennsylvania in Younger v. Plunkett, 395 F.Supp. 702 (E.D.Pa. 1975), concluded in a substantially similar case, that Pennsylvania law, as it presently exists, requires consent by the owner to render such a lien valid.
We have no difficulty in holding that Natalie's acquired possession of Mr. Gnas' automobile without the owner's express consent. The matter of Mr. Gnas' implied consent is considerably more difficult. Thus we come to the second contention pressed by Natalie's, that the consent or contractual relation needed for a common law lien can be inferred from § 1021.1 of The Vehicle Code, Act of April 29, 1959, P.L. 58 (75 P.S. § 1021.1), as amended. That section of the code provides in part:
"No person shall park or leave unattended a vehicle or tractor on private property without the consent of the *547 owner or other person in control or possession thereof, except in the case of emergency or disablement of the vehicle or tractor, in which case, the operator shall arrange for the removal of such vehicle or tractor as soon as possible.
The owner or other person in charge or possession of any land on which a vehicle or tractor is parked or left unattended in violation of the provisions of this section may remove or hire another person to remove such vehicle or tractor at the reasonable expense of the owner thereof."
Thus it is argued that by operating his vehicle on Pennsylvania highways, the vehicle owner implicitly consents to having his car towed under the circumstances described in § 1021.1. However, § 1021.1, unlike § 624.1 of The Vehicle Code, does not contain a specific implied consent provision. It is clear that under these circumstances, the vehicle owner does not consent to having his vehicle towed. The very purpose of § 1021.1 is to codify the right of the landowner to remove a trespassing vehicle despite lack of consent on the part of the owner thereof.
It is true that courts have occasionally found an implied consent on which to base a lien. However, the circumstances of those cases supplied reasonable grounds to believe that the owner would have consented had he been asked. R. Brown, supra, § 111. Consent is not implied where it is obvious that the owner would not have consented.
The third suggested basis for the existence of a lien in this case is statutory. Natalie's contends that it is given an express lien by section 1021.1 of The Vehicle Code. Natalie's notes that the court in Younger, supra, did not mention the existence of this statute in its opinion. However, it is clear that the statute does not create a lien.
Undoubtedly, the statute does give a landowner the right to charge a vehicle owner with the reasonable expense of removing an illegally parked vehicle from his land. However, *548 not every right gives rise to a lien. If the legislature had intended a lien to arise under these facts, it would specifically have said so. See, e.g., Act of April 29, 1959, P.L. 58, § 1222 (75 P.S. § 1222), as amended. The statute contains no mention of a lien, and a court may not create a lien where one does not exist merely to effectuate its idea of justice. 51 Am.Jur.2d, Liens § 6 (1970).
Natalie's contends that without a lien, § 1021.1 is meaningless because no practical means exist to enforce the right given in that section. However, the same complaint may be levelled at many rights. In many cases, it is impractical to attempt to obtain and enforce a judgment. However, one does not have the right to take possession of a debtor's property because other means of enforcement are impractical.
The federal district court in Younger, supra, recognized that the regrettable import of its decision left property owners with an incomplete remedy. The lower court in this case expressed the same sentiments. This court, too, recognizes the apparent deficiency in the available remedies; however, it is a deficiency which must be cured, if at all, by legislative action, either at the state or local level.
In the action for declaratory relief, at No. 977, the lower court dismissed the petition because no true case or controversy existed. Under the facts of this case, we must agree. It is well settled that declaratory relief is available only:
"where (1) an actual controversy exists between contending parties, or (2) where the court is satisfied that antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation, or (3) where in any such case the court is satisfied that a party asserts a legal relation, status, right, or privilege in which he has a concrete interest and that . . . there is a challenge or denial of such asserted relation, status, right, or privilege by an adversary party who also has or asserts a concrete interest therein . . . and the court is *549 satisfied also that a declaratory judgment or decree will serve to terminate the uncertainty or controversy giving rise to the proceeding." Act of June 18, 1923, P.L. 840, § 6 (12 P.S. § 836), as amended.

The controversy to be resolved in this case is whether one who tows a vehicle at the request of another who is not the vehicle owner has a possessory lien on the vehicle for the costs of towing and storage. In No. 978, we have decided that no lien exists, and, therefore, the garageman has no right to hold the vehicle until the vehicle owner pays a fee. A garage owner who so held a vehicle would be risking a suit for conversion. See Murrell v. Trio Towing Service, Inc., 294 So.2d 331 (Dist.Ct.App.Fla. 1974). Thus, a determination of whether such conduct constitutes theft would be of little practical effect. We entertain serious doubts as to the likelihood that Natalie's will continue to assert a lien in light of our decision in No. 978.
Our reluctance to decide the declaratory judgment issue in the absence of a case or controversy is well founded. The case presents difficult issues which should not be confronted lightly. It is clear that under The Penal Code, Act of June 24, 1939, P.L. 872, § 101 (18 P.S. § 4101) et seq., repealed, Act of December 6, 1972, P.L. 1482, No. 334, § 5, the existence of a good faith claim of right to possession of property would negate criminal liability for larceny. Commonwealth v. Compel, 236 Pa.Super. 404, 344 A.2d 701 (1975). Cf. Commonwealth v. English, 446 Pa. 161, 279 A.2d 4 (1971). The Model Penal Code, from which the Crimes Code was derived, specifically includes the claim of right defense. Model Penal Code § 223.1(3). The Crimes Code, 18 Pa.C.S. § 101 et seq., does not specifically include that defense. At this juncture, we need not determine the effect of this omission.
Another question which we defer today is whether a declaratory judgment is an appropriate procedure for the interpretation of criminal statutes. In Packel v. Takiff, 457 Pa. 14, 321 A.2d 649 (1974), the Attorney General of Pennsylvania sought a declaratory judgment as to the validity of *550 the Philadelphia Grand Jury. The supreme court denied the petition on two grounds: (1) the petition sought an advisory opinion, and (2) "The Uniform Declaratory Judgment Act, Act of 1923, supra, does not authorize the entry of judgments in criminal matters." 457 Pa. at 17, 321 A.2d at 650. No other authorities were cited for the latter proposition, and no rationale justifying the conclusion was set forth to enable us to interpret the scope of the decision. The clear weight of authority is to the contrary. Annot., 10 ALR3d 727 (1966). Furthermore, it would seem that having to risk prosecution and criminal sanctions in order for honest citizens to obtain an interpretation of the law is one of the dilemmas which the Uniform Declaratory Judgments Act was designed to avoid. W. Anderson, Actions For Declaratory Judgments § 624 (2d ed. 1951); E. Borchard, Declaratory Judgments 1020 (2d ed. 1941). This issue, too, must await a true controversy.
The orders of the lower court are affirmed.
CERCONE, J., files a concurring and dissenting opinion.
WATKINS, President Judge and JACOBS, J., dissent.
CERCONE, Judge, concurring and dissenting:
While I agree with the majority's disposition of the declaratory judgment action in the instant case, I disagree with its affirmance of the lower court's order at No. 978. The difficulty with the majority's decision, and that of the court below, is its failure to distinguish the towing company's right to collect the costs of towing and storing appellee's car from its "right" to hold the automobile pursuant to a lien. As a consequence, the majority opinion reaches the conclusion that the towing company is not entitled to keep the money paid for towing and storage because it asked for it in the wrong way; that is the towing company was impolite enough to suggest that it would not release appellee's car unless he paid the towing charges. Of course, appellee's very argument for refund implies that he would not have paid the towing charges except under such a threat. In my *551 opinion, the towing company's threat is irrelevant since prior to the instant litigation the parties had adjusted the dispute to reach precisely the result a further and needless lawsuit would produce.
The majority sets the wrong course when it rests its decision on the no lien issue. The question is whether appellee's trespass caused damages to the owner of the parking lot for which the towing company was a proper party to collect. Forgetting for a moment the question whether the towing company's "threat" to retain the automobile if the charges were not paid affects the rights and remedies of the parties, the towing company was clearly still entitled to collect the towing charges from appellee. Restatement of Torts § 923, provides that a tortfeasor may set-off against a claim by an injured party any sum paid to a third person which satisfied a debt which the tortfeasor's conduct caused the injured party to incur. Comment b to Section 923 provides in pertinent part: "Where the defendant's tort causes the plaintiff to be liable to a third person, the tortfeasor can terminate all but consequential damages by payment of the claim." In the instant case appellee's trespass caused the owner of the parking lot to incur a debt to the towing company. Even if we assume arguendo that appellee had the legitimate alternative of paying the amount of the debt either to the towing company or the landowner,[1] he did not have the alternative of not paying the debt at all. Hence, it should be clear that, except for the towing company's threat to detain the car if the charges were not paid, appellee would not be entitled to recover the $25.30, because he would be unjustly enriched thereby at the expense of either the towing company or the parking lot owner. Restatement, Restitution § 1, Comment b.
The question then becomes whether the towing company's threat to detain the car somehow altered its right to retain the $25.30 in towing and storage charges. This is the issue *552 which leads the majority on unnecessary search for the elusive lien.[2] However, if we assume for the sake of argument that the towing company's detention of the car would have been tortious, it does not follow that appellee's remedy is recovery of the $25.30 charged for towing and storage, plus interest. Section 931 of the Restatement of Torts entitled, "Detention of Land or Chattels" provides the measure of damages for tortious detention of a chattel:
"Where a person is entitled to a judgment for the detention of, or for preventing the use of, land or chattels, the damages include an amount for
(a) the value of the use during the period of detention or prevention, or the value of the use of or the amount paid for a substitute, and
(b) amount for harm to the subject matter or other harm or which the detention is the legal cause."
As the Restatement makes clear, appellee's appropriate measure of damages is the value of loss of use of the vehicle during the period of wrongful detention; in this case arguably from the time when appellee's brother demanded return of the vehicle to the time he paid the towing and storage charges and received the vehicle. Obviously, given the brevity of the detention in this case, such damages would be trivial. Appellee's remaining measure of damages, since the automobile itself was not damaged, is "other harm of which the detention is the legal cause." Presumably, appellee would argue that it was the towing company's threat to detain his car which caused him to pay the $25.30. Whatever practical significance this argument may have, the towing company's threat to detain the automobile was not the legal cause of appellee's parting with the $25.30. As discussed above, appellee's tortious conduct caused him to become liable for the towing and storage charges. Because *553 appellee was legally obliged to pay $25.30 prior to the threat to detain the car, he may not be heard to say that the threat forced him to pay what he otherwise would not have paid. At least, the threat cannot be viewed as the legal cause of the payment. Nor did the threat constitute actionable duress, for it did not force appellee to forego a choice which he was legally entitled to make; i.e., not pay the charges. See Restatement, Torts § 871, Comment f.
In short, with respect to Natalie's Towing Co., the lower court's order, which the majority affirms, disrupted the proper adjustment of liabilities which the parties, albeit extralegally, achieved; and, this conclusion can be reached without the necessity of finding a lien for the towing company. By restoring the $25.30 plus interest the court wrongfully permits appellee to profit, by free parking, at the expense of both the towing company and the owner of the parking lot. See Restatement, Restitution § 3. Hence, I would reverse the order of the lower court with respect to No. 978.
NOTES
[1] The record contains evidence of more serious interferences. In one instance, a homeowner discovered an automobile parked in her recently planted flower bed. In another, a pregnant woman's attempt to reach the hospital was frustrated for twenty minutes by a parked car that blocked her driveway.
[2] The fee was determined by the costs Natalie's incurred in towing and storing the vehicles, insurance, taxes, and a small amount of profit. The base fee was $25.30. Emanuel Natalie testified that if towing a car required special equipment, as it often did, the fee was correspondingly higher.
[1] It seems clear that the law would have little difficulty finding either an equitable assignment of the claim for the debt to the towing company, or that the towing company was an equitable subrogee. See D. Dobbs, Remedies 250-52 (1973).
[2] I do not mean to imply that legal justification for the towing company's detention of the car is impossible to find, for I have not fully researched the question. However, it is at least more difficult to determine than the towing company's right under my analysis. Certainly, many obstacles would be removed if the legislature amended the statute in question to expressly provide for a lien.