**In re ONE MERIDIAN PLAZA
FIRE LITIGATION.**

Civ. A. Nos. 91–2171, 91–2172, 91–2226,
91–2227, 91–2374, 91–2545, 91–2546
and 91–2547.

United States District Court,
E.D. Pennsylvania.

April 15, 1993.

Harold Berger, Berger & Montague, P.C., Mark R. Rosen, Mesirov, Gelman, Jaffe, Cramer & Jamieson, Paul R. Rosen, Ann Miller, Spector, Gadon & Rosen, P.C., Alan C. Kessler, Buchanan Ingersoll Professional Corp., Philadelphia, PA, Henry F. Siedzikowski, John M. Elliott, Timothy T. Myers, Mark A. Kearney, Blue Bell, PA, for plaintiffs.

Robert W. Hayes, Kevin P. Oates, Cozen & O'Connor, Philadelphia, PA, for Richard I. Rubin & Co., Inc., Pan American Office Investments, Inc.

E. Parry Warner, Obermayer, Rebmann, Maxwell and Hippel, Robert W. Hayes, Kevin P. Oates, Cozen & O'Connor, Philadelphia, PA, for E/R Associates.

Robert W. Hayes, Kevin P. Oates, Cozen & O'Connor, Philadelphia, PA, Donald T. MacNaughton, Jeffrey Barist, White & Case, New York City, for Equitable Life Assur. Soc. of the U.S., Equitable Real Estate Inv. Management, Inc.

Stephen A. Cozen, Robert W. Hayes, Kevin P. Oates, Cozen & O'Connor, Philadelphia, PA, Kathleen M. Comfrey, Shearman & Sterling, New York City, for USA One Associates, USA One B.V. and USA Two B.V.

Michael P. O'Connor, Michael J. Dunn, Ivan J. Krouk, Cynthia Philo, Murphy and O'Connor, Philadelphia, PA, for Rodin Inv. Admin. Co.

Stephen A. Cozen, Robert W. Hayes, E.J. Borrack, Cozen & O'Connor, Philadelphia, PA, Lynette C. Kelly, Kathleen M. Comfrey, Shearman & Sterling, New York City, for Algemeen Burgerlijk Pensioenfonds.

Barbara W. Mather, Pepper, Hamilton & Scheetz, Philadelphia, PA, for Aetna Cas. & Sur. Co., Aetna Life Ins. Co.

Robert W. Hayes, Kevin P. Oates, Cozen & O'Connor, Philadelphia, PA, for Jones Lang Wootton USA.

Joseph K. Hetrick, Norbert F. Bergholtz, Dechert, Price & Rhoads, Philadelphia, PA, Terrence E. Bishop, Mel I. Dickstein, James D. Steiner, Robins, Kaplan, Miller & Ciresi, Minneapolis, MN, for Balis & Co.

John S. Tucci, Jr., John W. Walter, Marshall, Dennehey, Warner, Coleman and Goggin, Philadelphia, PA, for Penn Sprinkler Co., Inc.

Samuel J. Pace, Jr., James L. Moore, Jr., Leslie Martinelli Cyr, Labrum and Doak, Philadelphia, PA, for Delmont Fire Protection Service, Inc.

Steven H. Berkowitz, Southampton, PA, for James Webster.

Joel D. Gusky, Harvey, Pennington, Herting & Renneisen, Ltd., Philadelphia, PA, for American Bldg. Maintenance Co.

E. David Chanin, Bennett G. Picker, George E. Pallas, Bolger, Picker, Hankin & Tannenbaum, Philadelphia, PA, for National Guardian Sec. Services Corp.

John M. Phelan, Phillips & Phelan, Philadelphia, PA, for F.X. Griffin.

Michael P. McKenna, Margolis, Edelstein, Scherlis, Sarowitz & Kraemer, Philadelphia, PA, for Halprin Supply Co., Inc., Sierra Fire Equip. Co.

Charles J. Bloom, Stevens & Lee, P.C., Wayne, PA, Barry E. Cohen, Crowell & Moring, Washington, DC, for Rubinetterie A. Giacomini Spa.

Peter F. Vaira, John E. Riley, North & Vaira, Philadelphia, PA, Geoffrey A. Lewis, Underwriter's Laboratories, Inc., North Brook, IL, John J. Verscaj, Bell, Boyd and Lloyd, Chicago, IL, for Underwriters Laboratories, Inc.

Basil A. Di Sipio, Lavin, Coleman, Finarelli & Gray, Philadelphia, PA, for Premier Industrial Corp., Akron Brass Company.

Robert M. Britton, Philadelphia, PA, for Task Force Tips, Inc.

Barry Brownstein, Richard E. Arvidson, Michael A. Sicola, Dean Constantine, Mor-

gan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski, Livingston, NJ, for Maris Equip. Co.

Steven M. Mezrow, Steven M. Mezrow & Assoc., Philadelphia, PA, for the Energy Consortium, Inc.

John J. Mulderig, Brown & Connery, Westmont, NJ, Paul A. Koches, Joseph Brooks, Popham, Haik, Schnobrich & Kaufman, Ltd., Washington, DC, for Honeywell, Inc.

Lawrence S. Sarowitz, Jay E. Mintzer, Michael C. Nugent, Edelstein, Mintzer & Sarowitz, Philadelphia, PA, for Pyrotol Systems, Inc., Div. of Potter Elec. Signal Co.

Adolph F. Fellmeth, III, Jenkintown, PA, for Webster Automation Systems, Inc.

Jane North, Edward J. David, Mylotte, David & Fitzpatrick, Philadelphia, PA, for John Ashe Associates, Inc.

Patricia L. Dee, Thomas H. Morgan, Capehart & Scatchard, P.A., Mount Laurel, NJ, for H.B. Frazer and Co., Inc.

Enid R. Stebbins, Trina M. Bragdon, Saul, Ewing, Remick & Saul, Philadelphia, PA, for Nason & Cullen, Inc.

R. Thomas McLaughlin, Kelly McLaughlin & Foster, Philadelphia, PA, for Sheward Henderson.

Ralph J. Luongo, Rawle & Henderson, Philadelphia, PA, for M & M Equipment Co.

### MEMORANDUM

BUCKWALTER, District Judge.

I. *Introduction*

This litigation arose as a result of a fire at the One Meridian Plaza building in downtown Philadelphia which began on February 23, 1991. Various parties, none of whom were tenants of One Meridian Plaza at the time of the fire, have brought claims for uninsured losses. All of the initial complaints filed in the above cases were consolidated into the "One Meridian First Consoli-

dated Amended Class Action Complaint" (hereinafter the "Complaint"). Each of the defendants has filed a separate motion to dismiss the Complaint, a motion for a more definite statement, a motion to strike, or some combination thereof (hereinafter simply "motions to dismiss").[1]

Each motion contains numerous sections. Many of these sections are common to many or all of the motions to dismiss. In addition, some defendants have raised arguments which, although not raised by other defendants, apply to other defendants. Wherever any defendant's motion demonstrates that plaintiffs have failed to state a claim against all defendants, the dismissal of the claim will apply to all defendants. Where a defendant makes an argument on its own behalf only, of course, the portion of this opinion which discusses that argument will apply only to that defendant. In the end, each defendant stands alone and the order following this opinion reflects the differences in the resolution of issues as applicable to each defendant.

The facts of the case are common to all defendants' motions. Where necessary, facts applicable only to a specific defendant are included in the section of the opinion corresponding to that defendant and its motion. The standard of review in a motion to dismiss, of course, is the same for all defendants and all of the instant motions. When reference is made to a "defendant's memorandum," (i.e. "Delmont's Memorandum" or "Balis' Memorandum") it is to that defendant's memorandum in support of its motion to dismiss. Plaintiff has responded with one collective memorandum in opposition to all of the motions. When reference is made to "Plaintiffs' Memorandum," it is to that collective memorandum.

Subsequent to the filing of these motions, plaintiffs' response and defendants' replies, plaintiffs filed a motion to amend the Complaint.[2] The proposed second amended complaint, attached to plaintiffs' motion, has indi-

---

1. Several defendants filed a motion to dismiss before the plaintiffs filed their amended, consolidated complaint. Those motions to dismiss have been replaced by the instant motions and are denied as moot.

2. This motion has been denied without prejudice.

cated plaintiffs' acquiescence to the dismissal of the following:

1. All claims by Constitution Bancorp., N.A. and Louis J. Boundonna;

2. All allegations against "potential co-defendants";

3. Certain allegations which defendants characterized as irrelevant and impertinent.

Thus, these matters, all of which were raised in the motions to dismiss, are dismissed.

## II. *Facts*

This litigation arose from the fire which occurred on Saturday, February 23, 1991, at the One Meridian Plaza building ("One Meridian" or "the Building") in downtown Philadelphia. Since the fire, One Meridian has been shut down, as has Two Mellon Bank Center ("Two Mellon"), which is adjacent to One Meridian. The City of Philadelphia barred access to an area surrounding the Building for some time after the fire due to the threat of falling granite or other debris.

### A. The Parties

There are numerous plaintiffs and defendants, and it is important to identify all of them in order to resolve the motions to dismiss[3]. It is also important to note whether the plaintiffs sustained any property damage as a direct result of the fire, the (potential) classes of which each plaintiff is a member[4], and which causes of action they assert.

*Plaintiffs:*

1. Ejay Travel, Inc. ("Ejay"): It is alleged that Ejay is a corporation which leased space near One Meridian, and that water and debris entered and damaged Ejay's premises as well as its business furniture, equipment and records. (¶ 3)[5]. The threat of falling debris and the closure of the street on which Ejay is located prevented Ejay from repairing its premises and resuming business. Ejay is a member of proposed Classes C, D,

and E and asserts all causes of action in the Complaint against defendants.

2. Nancy Dembowski ("Dembowski"): It is alleged that Dembowski's place of employment was located at One Meridian and that personal property located at her place of employment was destroyed. (¶ 4). She is a member of proposed Classes A, D and E and asserts all causes of action in the Complaint against defendants.

3. Virginia L. Grandy ("Grandy"): It is alleged that Grandy's place of employment was located at One Meridian and that personal property located at her place of employment was destroyed. (¶ 5). She is a member of proposed Classes A, D and E and asserts all causes of action in the Complaint against defendants.

4. T. Sean Crumlish ("Crumlish"): It is alleged that Crumlish is an employee and sales representative of Equitrac Corp., and was a provider of goods and services to tenants of One Meridian and Two Mellon, and that personal property belonging to him was destroyed or lost. (¶ 6). He also lost commissions, income, and actual and potential clients and business. He is a member of proposed Classes A, D and E and asserts all causes of action in the Complaint against defendants.

5. Robert Allen ("Allen"): It is alleged that Allen's place of employment was located at One Meridian, and that he suffered damage to his personal property and economic harm. (¶ 9). Allen is a member of proposed Classes A, D, and E and asserts all causes of action in the Complaint against defendants.

6. Regent 15th Street, Inc., d/b/a Giorgio Brutini ("Regent Shoes"): It is alleged that Regent Shoes is a corporation which rented and operated a commercial establishment near One Meridian until the fire, and that it suffered physical harm to its business premises, furniture, equipment, inventory and other personal property as well as business loss and interruption. (¶ 10). Regent Shoes is a member of proposed Classes C, D, and E and

---

**3.** The factual narrative, as well as the identification of the parties, is taken from the Complaint.

**4.** A motion for class certification filed by plaintiffs is currently pending before this court.

**5.** Paragraph references throughout this opinion are to the Complaint.

asserts all causes of action in the Complaint against defendants.

7. LegXpress, Inc. ("LegXpress"): It is alleged that LegXpress is a corporation which operated a hosiery store located near One Meridian. LegXpress has alleged business loss and interruption but no property damage. (¶ 11). It is a member of proposed Class E and asserts only Count VI (public nuisance) of the Complaint against defendants.

8. Pennsylvania Square Corp. ("Square Corp."): It is alleged that Square Corp. is a corporation which operated parking facilities for the general public near One Meridian. Square Corp. has alleged business loss and interruption but no property damage. (¶ 12). Square Corp. is a member of proposed Class E and asserts only Count VI (public nuisance) of the Complaint against defendants.

9. Anthony Vinciguerra ("Vinciguerra"): It is alleged that Vinciguerra leased and occupied space in Two Mellon at the time of the fire and that his space and business was "touched and physically invaded by water, smoke and airborne toxins and the ingress and egress to plaintiff's space and business was physically blocked by barricades and other fire safety equipment or materials." (¶ 13). Vinciguerra is a member of proposed Classes B, C, D, and E and asserts all causes of action in the Complaint against defendants.

10. John M. Corcoran ("Corcoran"): It is alleged that Corcoran leased and occupied space and conducted business in Two Mellon at the time of the fire and that his space and business was touched and physically invaded by water, smoke and airborne toxins and the ingress and egress to plaintiff's space was physically blocked. (¶ 14). Corcoran is a member of proposed Classes B, C, D, and E and asserts all causes of action in the Complaint against defendants.

11. Sunshine Personnel, Inc. ("Sunshine"): It is alleged that Sunshine is a corporation which leased premises in the area of Philadelphia closed to pedestrian and vehicular traffic. (¶ 15). Sunshine has alleged business interruption and damage to its business but no property damage. Sunshine is a member of proposed Classes D and E and asserts all causes of action in the Complaint against defendants.

12. Royal Bank of Pennsylvania ("Royal Bank"): It is alleged that Royal Bank is a corporation which leased premises in the area of Philadelphia closed to pedestrian and vehicular traffic, and that it incurred physical harm to its business premises, furniture, equipment inventory and suffered other personal and real property damage. (¶ 16). Royal Bank is a member of proposed Classes C, D, and E and asserts all causes of action in the Complaint against defendants.

13. Robert J. Atlee ("Atlee"): It is alleged that Atlee's place of employment was located at One Meridian, that personal property owned by him was destroyed and that he lost his employment as a result of the fire. (¶ 17). He is a member of proposed Classes A, D, and E and asserts all causes of action in the Complaint against defendants.

14. Triumphe Financial Services ("Triumphe"): It is alleged that Triumphe is a corporation which provided various financial, accounting and computing goods and/or services to occupants of the Building. (¶ 18). Triumphe has alleged lost income and actual and potential clients and business but no property damage. It is a member of proposed Classes C, D, and E and asserts all causes of action in the Complaint against defendants.

15. C.W.D. Enterprises Ltd. d/b/a Chris' Cafe and Bar ("Chris' Cafe"): It is alleged that Chris' Cafe suffered smoke and odor damage to its property and premises, which is located near One Meridian, and also suffered business loss and interruption and damage to its business as a result of the fire. (¶ 19). It is a member of proposed Class E and asserts only Count VI (public nuisance) of the Complaint against defendants.

16. The Happy Rooster, Inc. ("The Happy Rooster"): It is alleged that the Happy Rooster is a corporation which suffered smoke and odor damage to its property and premises which is located near One Meridian. (¶ 20). It also alleges business interruption and damage to its business as a result of the fire. It is a member of proposed Class E

and asserts only Count VI (public nuisance) of the Complaint against defendants.

*Potential Plaintiff Classes* [6]:

*Class A*: This class includes persons or entities who owned or leased property located in One Meridian which was damaged by the fire or efforts to suppress the fire or conditions that existed in the aftermath of the fire. (¶ 40a).

*Class B*: This class includes persons or entities who owned or leased property located in Two Mellon which was damaged by the fire or efforts to suppress the fire or conditions that existed in the aftermath of the fire. (¶ 40b).

*Class C*: This class includes persons or entities who owned or leased property outside of One Meridian and Two Mellon which was damaged by the fire or efforts to suppress the fire or conditions that existed in the aftermath of the fire. (¶ 40c).

*Class D*: This class includes persons or entities who resided, worked, owned or leased real or personal property, conducted business, provided goods or services, or engaged in other enterprises or endeavors in the area of Philadelphia to which access was limited because of the fire and who or which suffered harm on account of the threat of physical harm or the closure of the City's streets. (¶ 40d).

*Class E*: This class includes persons and entities who conducted business or engaged in other enterprises or endeavors in Philadelphia who suffered harm as a result of the obstruction and closing of public ways and streets as a result of the fire which harm is different in kind from the inconvenience suffered by other members of the general public. (¶ 40e).

6. Every class specifically excludes the tenants of One Meridian Plaza, all defendants named, and unnamed additional defendants in this action, their parents, subsidiaries, affiliates, officers, directors, shareholders, representatives and agents.

7. All of the Owner/Manager Defendants except Rodin and ABM have filed one collective motion to dismiss. The defendants who filed that motion refer to themselves as the "E/R Defendants." ABM has moved to dismiss all claims brought

*Defendants:*

1. Owner/Manager Defendants: The Complaint has designated the following defendants, collectively, as the Owner/Manager Defendants [7]:

* Richard I. Rubin & Co., Inc. ("Rubin"): It is alleged that Rubin is a corporation which managed the Building and was responsible for its safety including all fire detection, suppression and protection systems. (¶ 21).

* Equitable Life Assurance Society of the United States ("Equitable"): It is alleged that Equitable is a mutual insurance company and an owner of One Meridian. (¶ 22).

* E/R Associates: It is alleged that E/R Associates is a Pennsylvania partnership and an owner of One Meridian. (¶ 23).

* USA One Associates: It is alleged that USA One Associates is a Pennsylvania partnership of USA One BV and USA Two BV and a general partner of E/R Associates. (¶ 24).

* USA One BV: It is alleged that USA One BV is a Netherlands corporation and a general partner in USA One Associates. (¶ 25).

* USA Two BV: It is alleged that USA Two BV is a Netherlands corporation and a general partner in USA One Associates. (¶ 26).

* Algemeen Burgerlijk Pensioenfonds ("ABP"): It is alleged that ABP is a Dutch pension fund. (¶ 27). It is further alleged that USA One BV and USA Two BV are wholly owned subsidiaries of USA Holdings, BV, which is a Netherlands corporation and a wholly owned subsidiary of ABP.

* Pan American Office Investments, Inc. ("Pan American"): It is alleged that Pan American is an agent, subsidiary, and/or affiliate of the other Owner/Manager Defendants

against it as an Owner/Manager Defendant, contending that it is neither owner nor manager. Plaintiffs' lack of response to this aspect of ABM's motion may be viewed as concurrence, and thus ABM is not considered to be an Owner/Manager Defendant. Rodin made no such motion and thus allegations made against Owner/Manager Defendants include E/R Defendants and Rodin.

and/or managed One Meridian in conjunction with Rubin. (¶ 28).

\* Rodin Investment Administration Company ("Rodin"): It is alleged that Rodin is an agent, subsidiary and/or affiliate of ABP, USA One BV, USA Two BV and/or USA One Associates. (¶ 29).

\* Equitable Real Estate Investment Management, Inc. ("Equitable Real Estate"): It is alleged that Equitable Real Estate is a foreign corporation and an agent, subsidiary, and/or affiliate of the other Owner/Manager Defendants and/or managed One Meridian in conjunction with Rubin. (¶ 30).

\* Jones Lang Wootton USA ("JLW"): It is alleged that JLW, along with Rubin, managed the Building and was responsible for its safety including its electric, sprinkler, internal hydrant and other fire protection systems. (¶ 31).

\* American Building Maintenance Company ("ABM"): It is alleged that ABM employed the security guards, building engineers and other personnel who were on duty at the time of the fire.

2. Balis & Co., Inc. ("Balis"): It is alleged that Balis is a corporation which occupied the office space in One Meridian where the fire started. (¶ 33).

3. Joseph F.X. Griffin ("Griffin"): It is alleged that Griffin was a construction, cleaning and/or service company hired by Balis to finish and/or refinish certain wall panels, and that Griffin left combustible and flammable solvents in Balis' offices which started the fire. (¶ 34).

4. Penn Sprinkler Company, Inc. ("Penn Sprinkler"): It is alleged that Penn Sprinkler is a corporation which was responsible for testing the inadequate internal pump, standpipe and hydrant system in One Meridian and improperly certifying that the pressure reduction valves produced adequate water pressure when, in fact, they did not. (¶ 35).

5. Delmont Fire Protection Service, Inc. ("Delmont"): It is alleged that Delmont is a corporation which modified the Building's standpipe system in 1988 and supplied the pressure restriction valves and pumps and/or equipment, piping, fittings and materials utilized with the standpipe system which were improperly installed and/or set such that the water supply to the Building's fire fighting system was grossly inadequate. (¶ 36).

6. National Guardian Security Services Corporation ("National Guardian"): It is alleged that National Guardian is a corporation which was hired by the Owner/Manager Defendants which failed to respond to the fire alarm call and/or that they installed, maintained, and/or inspected the failed automatic dialer located in the basement of One Meridian.

### B. The Fire

On Friday February 22 and/or Saturday, February 23, 1991, defendant Griffin, a company hired by defendant Balis to finish and/or refinish certain wall panels, left combustible and flammable solvents, including linseed oil, in Balis' offices on the 22nd floor. (¶¶ 34, 129). Linseed oil is highly combustible and, unless stored in a proper container, will spontaneously combust. (¶ 129). Plaintiffs allege that spontaneous combustion of the flammable liquids, and/or an electrical malfunction or other ignition sparked or reached the flammable liquids or fumes created thereby, started the fire at approximately 8:00 P.M. on Saturday evening February 23, 1991. (¶ 139).

The fire spread quickly on the 22nd floor due to the flammable solvents present on the floor. (¶ 141). Neither of the two security guards on duty called the fire department or National Guardian. (¶ 147). The report of the fire was first called in by a passer-by, at 8:23 P.M. (¶¶ 164, 165).

In the basement of the Building was an automatic dialer that was designed to automatically call the fire department or National Guardian; this dialer either failed to make the call or the relay of the call from National Guardian to the fire department was delayed. (¶¶ 148, 149). This dialer was intended to meet requirements imposed by the Philadelphia Code. (¶ 148).

Each floor of the Building is required to be a sealed membrane with no openings or gaps between floors, so that a fire cannot spread from floor to floor. (¶ 155). Furthermore,

each floor has an electrical room, and the electrical room is supposed to be sealed off *from* the rest of the floor, and from the adjoining electrical rooms, so that a fire cannot breach an electrical room, but if it did, the fire could not spread from floor to floor through the electrical rooms. (¶ 157, 158). Due to a gap along the top of the north wall of the 22nd floor electrical room, and breaches in the seals between floors from the 22nd up to the 29th floor, the fire spread through the electrical fire tower[8], and the entire Building lost power. (¶¶ 153, 162, 169). The Building's emergency generator also failed, allegedly due to improper, inadequate and negligent inspection and maintenance and/or design and installation. (¶ 170). The firefighting efforts were hindered by the fact that there were no elevators and no lights. (¶ 171).

The efforts to fight the fire were hindered further by inadequate water pressure from the standpipe hydrants on the 22nd floor. (¶ 175).[9] This was allegedly due to the negligently installed pressure reduction valves ("PRV's") and because the hoses did not fit the fire hose connectors installed and inspected by Delmont and/or Penn Sprinkler and negligently maintained by the Owner/Manager Defendants. (¶ 175, 179).

Additionally, the restriction and/or modulating valves attached to the 12th floor fire pump were negligently installed, inspected and maintained by Delmont and/or Penn Sprinkler, thus rendering the pump ineffective to place water with sufficient pressure and flow to the so-called indoor hydrants on the upper floors. (¶ 185).

Comcast Cable–Vision, a tenant of One Meridian, had installed sprinklers at its own expense on the 30th floor. (¶ 52). These sprinklers finally contained the fire. (¶ 52).

There were no sprinklers at One Meridian on the 22nd floor, where the fire started, or on the seven floors above it. (¶ 53).

### C. Causes of Action

*Count I: Negligence Per Se*

Plaintiffs allege that defendants violated state and local legislative and administrative enactments, and thus violated their statutory duty to adhere to these enactments. (¶¶ 227–231). Plaintiffs have demanded compensatory damages for uninsured property loss and economic harm, attorneys' fees and punitive damages.

*Count II: Negligence*

Plaintiffs allege that defendants had a duty to plaintiffs, and that as a "direct, proximate and reasonably foreseeable result of defendants' breach of duty," plaintiffs have suffered substantial harm. (¶¶ 232–238).

Specifically, plaintiffs' allegations of negligence include the following:

1. The Owner/Manager Defendants negligently reconstructed, inspected and maintained the fire towers of One Meridian, including the electrical fire tower, and allowed numerous breaches of the fire towers. (¶ 76).

2. The seals between numerous floors, including the seals between the 22nd and 23rd floors and the other fire floors, were missing, allowing the fire to spread up the electrical fire tower. This allegedly constituted gross negligence on the part of the Owner/Manager Defendants. (¶ 79).

3. The Owner/Manager Defendants, Penn Sprinkler, Delmont and National Guardian violated various provisions of The Philadelphia Code and BOCA.[10].

---

**8.** A fire tower is a sealed tower that runs from the sub-basement to the roof which is required to be sealed off from the floor space of the Building to provide egress and ingress to the fire floors without allowing the fire to breach the integrity of the fire tower. (¶ 156). In addition to the electrical fire tower, the elevator shaft was supposed to be a fire tower as were three stairwells. (¶ 68, 72).

**9.** A "standpipe system" is designed to produce high-pressured water flow on each floor so that

fires could be effectively fought from the inside of high-rise buildings. Pressure reduction valves ("PRV's") or allocation valves are utilized to regulate pressure and assure adequate water flow. (¶ 87, 90).

**10.** "BOCA" refers to the BOCA National Building Code; the Philadelphia Code adopts by reference both BOCA and the National Fire Protection Association Code ("NFPA").

4. The Owner/Manager Defendants, Penn Sprinkler and Delmont:

(a) Failed to properly install, inspect, maintain, service and test the PRV's and the standpipe system, the electrical systems, elevator and/or the fire detection, prevention and fighting systems;

(b) Failed to properly report the results of inspections and testing of the PRV's, the standpipe system, the electrical systems, elevator and/or the fire detection, prevention and fighting systems;

(c) Failed to take note of and report defective or malfunctioning aspects of the PRV's, the standpipe system, the electrical systems, elevator and/or the fire detection, prevention and fighting systems, of which these defendants were aware or should have been aware;

(d) Recommended the use of materials and equipment and operation of systems which they knew or should have known were not adequate to protect plaintiffs in the event of fire; and

(e) Failed to recommend to the Owner/Manager Defendants or to notify plaintiffs that applicable safety statutes and regulations had not been and should be strictly adhered to. (¶ 95).

5. The Owner/Manager Defendants:

(a) Failed to warn plaintiffs that the Building did not have adequate fire alarm, control or fire suppression systems;

(b) Failed to warn plaintiffs that the Building was in violation of applicable laws and regulations relating to fire safety;

(c) Allowed the Building to be improperly designed, redesigned, constructed and renovated without regard for statutory and regulatory requirements pertaining to fire safety, and without regard to the ready availability of relatively inexpensive fire control and suppression systems;

(d) Failed to maintain adequate fire control and suppression systems, including fire seals, PRV's, water supply, electrical, ventilation and elevator systems;

(e) Refused to take action to prevent further and continuing injury to plaintiffs' property after the fire;

(f) Failed to ensure that contractors hired to install, maintain and inspect the Building's fire control and suppression systems did so in accordance with statutory and regulatory requirements. (¶ 118).

6. Penn Sprinkler, Delmont and/or the Owner/Manager Defendants negligently installed and calibrated the PRV's and subsequently improperly and negligently tested, inspected and maintained the PRV's and/or caused improper certification of the PRV's so that there was inadequate water pressure and flow in the Building and its standpipe system. (¶¶ 121–122). Plaintiffs allege that this constituted gross negligence. (¶ 122).

7. Griffin and Balis negligently left and maintained flammable solvents on the 22nd floor, which violated Chapters 5–1600, 5–1700 and 5–3100 of the Philadelphia Code which impose a duty to segregate, store and safekeep flammable and combustible liquids, finishes and other materials and conditions tending to create fire hazards. (¶¶ 131, 132).

8. Balis failed to properly supervise Griffin. (¶ 132).

9. The Owner/Manager Defendants improperly permitted Griffin and Balis to bring these materials into the Building and to undertake this type of activity, negligently failed to inspect properly the work area, and negligently failed to supervise properly the workers who negligently left the flammable solvents on the 22nd floor, and failed to remove the flammable solvents and liquids. (¶ 133).

10. The Owner/Manager Defendants violated their duty pursuant to Chapter 5–3400 of the Philadelphia Fire Code to train their personnel in fire safety procedures.

11. ABM employees failed to investigate a strong odor on the 22nd floor (¶ 134–135), an ABM employee improperly used an elevator to determine if there was a fire on the 22nd floor (¶ 143) and ABM employees failed to notify the Philadelphia Fire Department that there was a fire in the Building. (¶ 147).

*Count III: Strict Liability—Ultrahazardous Activity*

Plaintiffs allege that the Owner/Manager Defendants, Delmont, Penn Sprinkler and

National Guardian were engaged in an abnormally dangerous and ultrahazardous activity and therefore owed an absolute duty to plaintiffs to conduct their operations in a safe and proper manner. This alleged activity was "installing, implementing, constructing, maintaining, operating, testing and/or inspecting the fire alarm, detection, prevention, suppression, prevention [sic] and fire safety systems and/or the electrical, elevator, water, standpipe, lighting and ventilation systems." (¶ 240). Furthermore, plaintiffs allege that "operating One Meridian with the above-described sixteen inch gap in the electrical fire tower at the 22nd Floor, the other breaches in the integrity of the electrical fire tower, the improperly calibrated and negligently installed, calibrated, maintained, tested and inspected PRV's, the other numerous violations of the Philadelphia Code and BOCA as set forth above, and the failed products equipment and systems, created an ultrahazardous activity which could not be safe despite otherwise reasonable care." (¶ 242).

*Count IV: Trespass*

Plaintiffs allege that all defendants'[11] conduct was a substantial physical invasion and trespass in that, as a result of their conduct, smoke, airborne toxins, water, falling granite and/or other Building debris or physical barriers were discharged or placed upon the property of plaintiffs who are members of, and all other members of, proposed Classes A, B and C. (¶ 244–249).

*Count V: Private Nuisance*

It is alleged that all defendants unreasonably interfered with the use and enjoyment of the property of plaintiffs, including barring access thereto and causing damage thereto from smoke, airborne toxins, water, falling granite and/or other Building debris, and the threat of other physical damage, thereby causing a private nuisance. (¶¶ 250–255).

*Count VI: Public Nuisance*

Plaintiffs allege that defendants' conduct resulted in an unreasonable and significant interference with the right of the general public to use and traverse the public streets with safety and convenience, thereby giving rise to a public nuisance. (¶ 260). The closing and obstruction of the streets wholly and/or partly deprived plaintiffs of reasonable, safe and convenient access to their premises and/or businesses. (¶ 263). Plaintiffs also allege harm in addition to the harm suffered by the general public, in that:

(a) they have been deprived of their right of reasonable, safe and convenient access by others to their premises and/or places of business;

(b) they have suffered losses of profits and/or revenues which they obtain through their businesses and/or offices;

(c) they have suffered loss of use and enjoyment of real and/or personal property. (¶ 266).

*Count VII: Punitive Damages*

Finally, plaintiffs allege that "the fire raged uncontrollably for nineteen (19) hours because of gross violations of building and fire codes and because even the most basic fire control and suppression systems which existed at the Building failed shortly after the fire ignited." (¶ 271). It is further alleged that the Owner/Manager Defendants recklessly and wantonly disregarded the safety, well-being and livelihoods of plaintiffs and others by their conduct, including allowing the gap in the 22nd floor electrical room to exist, which gap allowed the fire to penetrate into the electrical fire tower, allowing the seals between floors to be missing, thereby permitting the fire to spread up the electrical fire tower, and allowing the PRV problems, as described above, to exist, thereby providing the Building with insufficient water pressure to fight the fire. (¶¶ 275, 78, 79, 122). Thus, plaintiffs request punitive damages so that others like the Owner/Manager Defendants will not "be permitted to sacrifice the lives, well-being, livelihoods and valuable property of individuals for the sake of a few more dollars in profit especially where, as here, the huge cost in life and property could have been readily avoided through the known and easily affordable means of installing new sprinklers and/or properly maintaining the

---

11. The allegations in this count are against "defendants;" ¶ 38 of the Complaint defines the term as all of the defendants unless otherwise indicated.

existing fire detection, control and suppression systems." (¶ 277).

### III. Standard of Review

A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Rocks v. Philadelphia*, 868 F.2d 644, 645 (3d Cir.1989). All well-pleaded factual allegations in the complaint must be taken as true. *Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081–82, 31 L.Ed.2d 263 (1972); *Rocks*, 868 F.2d at 645. The court must draw all reasonable inferences from the allegations and view them in the light most favorable to the non-moving party. *Rocks*, 868 F.2d at 645.

### IV. Discussion

#### A. Improper Demand for Damages

■ Several paragraphs of the Complaint make reference to damages in excess of the pertinent jurisdictional amount. Defendants have moved to dismiss, or, alternatively, to strike these references.[12] Local Rule 30 of the United States District Court for the Eastern District of Pennsylvania provides:

> No pleading asserting a claim for unliquidated damages shall contain any allegation as to the specific dollar amount claimed, but such pleadings shall contain allegations sufficient to establish the jurisdiction of the court, to reveal whether the case is or is not subject to arbitration under Local Rule 8, and to specify the nature of the damages claimed *e.g.,* "compensatory," "punitive," or both.

Defendants have also presented case law which establish that Pennsylvania courts have held that allegations of a sum certain in excess of the amount necessary to establish jurisdiction are immaterial, impertinent and inappropriate. *See, e.g., Strick Corporation v. Penn Yan Express, Inc.,* 62 F.R.D. 4, 5 (E.D.Pa.1974). Plaintiffs counter that it is the assertion of a purely arbitrary figure of damages that will be stricken. *See, e.g., Ryer v. Harrisburg Kohl Bros., Inc.,* 53 F.R.D. 404 (M.D.Pa.1971).

The local rule is clear and unambiguous. It states that no pleading asserting a claim for unliquidated damages shall contain *any* allegation as to the specific dollar amount claimed (emphasis added). Nothing is said about the reasonableness or arbitrariness of the figure. Defendants' motion to strike the specific sum in favor of a sum sufficient to establish this court's jurisdiction is granted.

#### B. Recovery for Purely Economic Loss

This issue is at the core of all of the motions to dismiss.[13] A large part of the damages that plaintiffs are demanding are for economic losses, including lost wages of employees and lost profits of businesses and individuals. Defendants argue that Pennsylvania law does not permit a plaintiff to recover economic damages in the absence of either personal injury or property damage (collectively, "physical harm"[14]). This is known as the economic loss doctrine.

Relying on the economic loss doctrine, defendants have asked that various parts of the Complaint be dismissed:

1. All claims for economic loss by plaintiffs who allege no property damage. Plaintiffs LegXpress, Square Corp., Sunshine, and Triumphe did not allege property damage.

2. All claims for economic loss by plaintiffs who allege property damage consisting of the "physical invasion" of smoke, odor, water, or airborne toxins, or denial of access to their property. Defendants argue that this harm does not qualify as physical harm. These plaintiffs include Vinciguerra, Corcoran, Chris' Cafe and The Happy Rooster.

3. All claims for economic harm by all plaintiffs. In order for economic loss to be compensable, defendants argue, the economic loss must flow directly from the property

---

**12.** This argument has been raised by Delmont, Rodin, Penn Sprinkler, Balis and ABM.

**13.** Only Penn Sprinkler did not raise this argument.

**14.** No plaintiff has alleged personal injury in this action. Therefore, in discussing the physical harm requirement, only the presence or absence of property damage is at issue.

damage, and no plaintiff alleged a causal relationship between the property damage pleaded and the economic harm claimed.

Plaintiffs have responded with several arguments:

1. Plaintiffs have alleged causes of action which do not require physical harm to recover economic damages, namely, strict liability for the operation of an abnormally dangerous activity, malicious, wanton and intentional conduct, private nuisance, public nuisance and trespass;

2. Plaintiffs state a negligence claim for the recovery of their economic losses even in the absence of physical harm;

3. Plaintiffs who alleged physical invasion by water, smoke, airborne toxins, odor and denial of access to their property have pled sufficient physical harm to recover in negligence; and

4. Plaintiffs have alleged adequate property damage, and the relationship between the property damage and economic loss is not at issue.

Within this section of this opinion, other issues raised in the various motions to dismiss will be resolved as a consequence, namely, the legal viability of the Complaint's counts for strict liability for an abnormally dangerous activity, public and private nuisance, and trespass.

### 1. The Economic Loss Doctrine, Generally

The Supreme Court of the United States first suggested the common law rule that no cause of action should exist for negligence that causes economic loss but no property damage in *Robins Dry Dock and Repair Co. v. Flint*, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927). The Supreme Court revisited the economic loss doctrine in *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), and concluded that the dismissal of claims for economic loss of parties who had suffered only economic loss was a sensible restriction to the potential liability occasioned by a single event, in that case, a defective product which caused supertankers to malfunction while at sea. The Court, after analyzing a series of potential plaintiffs, all of whom were arguably foreseeable, disapproved of the potential for such widespread liability, stating that "[t]he law does not spread its protection so far." (*Id., citing Robins Dry Dock,* 275 U.S. at 309, 48 S.Ct. at 135).

The doctrine is meant to protect a tortfeasor from tremendous liability for a single act. This is concisely explained by the court in *Stevinson v. East Ohio Gas Co.*, 47 Ohio Law Abs. 586, 73 N.E.2d 200 (1946):

If one who by his negligence is legally responsible for an explosion or a conflagration should be required to respond in damages not only to those who have sustained personal injuries or physical property damage but also to every one who has suffered an economic loss, by reason of the explosion or conflagration, we might well be appalled by the results that would follow.

The general rule is stated in the *Restatement* (Second) of Torts § 766C:

**Negligent Interference With Contract or Prospective Contractual Relation**

One is not liable to another for pecuniary harm not deriving from physical harm to the other, if that harm results from the actor's negligently

(a) causing a third person not to perform a contract with the other, or

(b) interfering with the other's performance of his contract or making the performance more expensive or burdensome, or

(c) interfering with the other's acquiring a contractual relation with a third person.

Furthermore, the doctrine provides a "bright line rule" which allows courts to easily determine who may recover for economic loss in lieu of making difficult foreseeability determinations.

The Supreme Court cases both involved federal admiralty law, and thus are merely persuasive to Pennsylvania courts. Nonetheless, these cases have been cited with approval in Pennsylvania, and it is clear that Pennsylvania utilizes the economic loss doctrine to limit liability in tort cases. The seminal case is *Aikens v. Baltimore and O.R. Co.*, 348 Pa.Super. 17, 501 A.2d 277 (1985). *Aikens*

involved the claims of employees of a plant damaged by a train derailment against the railroad for lost wages. These employees had suffered no property damage or personal injury. The Superior Court held that "no cause of action exists for negligence that causes only economic loss," and affirmed the grant of judgment on the pleadings for the defendant railroad. *Id.* 501 A.2d at 279. The court also expressly adopted § 766C of the *Restatement.* *Id.* Furthermore, the *Aikens* court specifically declined to adopt the rule of law in *J'Aire Corp. v. Gregory,* 24 Cal.3d 799, 157 Cal.Rptr. 407, 598 P.2d 60 (1979). The *J'Aire* court had held that "recovery for injury to one's economic interests, where it is the foreseeable result of another's want of ordinary care, should not be foreclosed simply because it is the only injury that occurs." *Id.* 157 Cal.Rptr. at 411–412.[15]

In *Moore v. Pavex, Inc.,* 356 Pa.Super. 50, 514 A.2d 137 (1986), a construction worker using a jackhammer ruptured a city water main. Plaintiffs, individuals and corporations doing business in the city, sought damages for losses they sustained as a result of the interruption of water service. The Superior Court upheld the lower court's ruling that "there could be no recovery for economic loss by the plaintiffs in this case who did not suffer *physical harm* to property in which they had a proprietary interest." *Id.* 514 A.2d at 138 (emphasis in original).

In *General Public Utilities v. Glass Kitchens of Lancaster, Inc.,* 374 Pa.Super. 203, 542 A.2d 567 (1988), corporations associated with the Pennsylvania Dutch tourist industry sought damages for economic loss due to the diminution of the number of visitors to Lancaster County caused by the Three Mile Island "nuclear incident." The Superior Court expressly declined the opportunity to modify the economic loss doctrine as it was enunciated in *Aikens.* In so doing, the court stated:

> The concerns we recognized in *Aikens* apply with equal weight to [plaintiffs'] claims even though their claims arise from a nu-

clear generating facility accident. Our decision in *Moore v. Pavex, Inc.,* 356 Pa.Super. 50, 514 A.2d 137 (1986), does not dictate a different result ... Importantly, then *Moore* reaffirmed the general rule of law that economic losses may not be recovered in tort absent any physical injury or property damage.

*Id.* 542 A.2d at 570.

Defendants argue that the rule of law illustrated by the above cases warrants dismissal of the claims for economic loss of all plaintiffs. Plaintiffs respond that under several theories of liability, including negligence, defendants can be held liable for economic loss even without allegations of property damage.

### 2. Strict Liability—Abnormally Dangerous Activity

Plaintiffs allege that the Owner/Manager Defendants, Delmont, Penn Sprinkler and National Guardian engaged in an abnormally dangerous activity, thereby subjecting themselves to strict liability for any harm which results from that activity. Plaintiffs' argument is twofold.. First, they argue, essentially, that operating a building, which includes maintaining fire prevention, detection and suppression systems, is an abnormally dangerous activity. Second, they argue that operating One Meridian as defendants did, with the gap in the electrical fire tower at the 22nd floor, the breaches in the integrity of the electrical fire tower, the improper maintenance of the PRV's and violations of the Philadelphia Code, was an abnormally dangerous activity.

Pennsylvania has adopted § 519 of the *Restatement* (Second) of Torts, which imposes strict liability on one who carries on an abnormally dangerous activity, and § 520, which discusses the factors which determine whether an activity is abnormally dangerous for strict liability purposes. *See Federoff v. Harrison Const. Co.,* 362 Pa. 181, 66 A.2d 817 (1949); *Villari v. Terminix Int'l, Inc.,* 663 F.Supp. 727 (E.D.Pa.1987).

This argument raises two issues:

---

**15.** The more recent case of *Peoples Express Airlines, Inc. v. Consolidated Rail Corp.,* 100 N.J. 246, 495 A.2d 107 (1985) also permitted recovery of purely economic loss. While not expressly rejected by Pennsylvania courts, the case was decided before *Aikens* and its progeny and was ignored.

1. Whether defendants' "activities" as characterized by plaintiffs are, in a legal sense, abnormally dangerous; and

2. If either activity is abnormally dangerous, whether the "harm" for which defendants are strictly liable includes economic harm.

§§ 519 and 520 of the *Restatement* read as follows:

§ 519. *General Principle*

(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

(2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

§ 520. *Abnormally Dangerous Activities*

In determining whether an activity is abnormally dangerous, the following factors are to be considered:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes.

■ There simply is no support in Pennsylvania law for plaintiffs' contentions. An activity is abnormally dangerous when it presents a high risk of harm even when performed with due care or even extraordinary care. In the first instance, the operation of the Building and its requisite safety systems is clearly an activity which, although requiring reasonable and perhaps extraordinary care, is not inherently an abnormally dangerous activity and does not present a high risk of harm when performed with due

care. This is demonstrated by *Matulevich v. Matulevich,* 345 Pa.Super. 507, 498 A.2d 939 (1985), where the Superior Court addressed the question of whether the handling of firearms (high powered rifles) is an abnormally dangerous activity. The court concluded that it was not, stating that while it was an activity that required "extraordinary care, the want of which imposes liability based on negligence," it was not an activity that imposed liability without a showing of negligence. *Id.* 498 A.2d at 941. In deciding whether an activity is abnormally dangerous, the key determination for the court is:

> [W]hether the risk created is so unusual, either because of its magnitude or because of the circumstances surrounding it, as to justify the imposition of strict liability for the harm that results from it, even though it is carried on with all reasonable care. In other words, are its dangers and inappropriateness for the locality so great that, despite any usefulness it may have for the community, it should be required as a matter of law to pay for any harm it causes, without the need of a finding of negligence.

*Albig v. Municipal Authority of Westmoreland County,* 348 Pa.Super. 505, 502 A.2d 658, 689 (1985) (quoting *Restatement,* § 520 Comment (f)). This discussion clearly contemplates an activity which has some societal usefulness, but carries with it inherent, unavoidable hazards. In this case, as plaintiffs themselves suggest, the risks could have been avoided by the exercise of reasonable care. Accordingly, strict liability is inappropriate for the "activity" of operating a building.

■ Taking it one step further, plaintiffs also contend that the manner in which defendants operated the Building made it an abnormally dangerous activity. This, however, is just a reiteration of plaintiffs' claims that defendants operated the Building negligently. Doing anything in an unreasonable and unsafe manner, as plaintiffs have alleged defendants have done with the maintenance and operation of the Building, will result in an abnormally dangerous situation, as the term is used in a non-legal sense. However, plaintiffs' wordplay does not bring this case within the scope of the principle of strict

liability. Plaintiffs' allegations rest on the notion that defendants failed to exercise care. This is clearly a negligence concept. A strict liability claim can be stated only if the activity itself, and not the manner in which the activity is performed, is abnormally dangerous.

Pennsylvania cases which have imposed strict liability for abnormally dangerous activities are clearly distinguishable. In *Bumbarger v. Walker*, 193 Pa.Super. 301, 164 A.2d 144 (1960) the court imposed strict liability for blasting, and in *Lutz v. Chromatex, Inc.*, 718 F.Supp. 413 (M.D.Pa.1989) the court found that the storage of hazardous waste could be the basis of a strict liability claim. These activities serve a legitimate purpose but carry with them risks which cannot be averted even with reasonable care.

This case is also distinguishable from the few cases plaintiffs have offered in support of their arguments. In *Lubin v. Iowa City*, 257 Iowa 383, 131 N.W.2d 765 (1964), the court considered the operation and maintenance of an underground water main to be an abnormally dangerous activity because the city chose to utilize the practice of burying cast iron pipe six feet underground. In using that method, there was no reasonable way to inspect the pipe; the city had to wait for breaks to occur in the pipes to call attention to problems. The court found that since the city chose to use this method to cut down maintenance costs, they also had to pay "the cost of doing business in this manner." *Id.* at 392, 131 N.W.2d at 771.

In addition to *Lubin,* plaintiffs cite *Sun Pipe Line Co. v. Tri–State Telecommunications, Inc.*, 45 Pa.D. & C.3d 135 (1986) [16] in their memorandum. However, this case was reversed *sub nom, Melso v. Sun Pipe Line Co.*, 394 Pa.Super. 578, 576 A.2d 999 (1990), *app. den.*, 527 Pa. 667, 593 A.2d 842 and *app. den., Sun Pipe Line Co. v. E.A. Designs, Ltd.*, 527 Pa. 668, 593 A.2d 843 (1991); the court held that the operation and maintenance of a petroleum pipeline under a housing development is not an abnormally dangerous activity. The lower court had held that this activity was abnormally dangerous;

the reversal of this holding refutes in the most convincing possible way that plaintiffs' reliance on it is misplaced. The *Sun Pipe Line Co.* case is similar to the *Lubin* case and thus rejects the *Lubin* court's reasoning. Furthermore, the *Lubin* case is distinguishable in that broken pipes were an inevitable and accepted part of the method of maintaining the water main as Iowa City did; it is fair that Iowa City bear the costs. In this case, a fire and its rampant spread was certainly not inevitable or accepted; if defendants are to be liable, some fault must be proven.

Furthermore, even if either "activity" is an abnormally dangerous one for strict liability purposes, this does not allow plaintiffs to avoid the economic loss doctrine. Plaintiffs have attempted to make a distinction between the definitions of "harm" and "physical harm" in the *Restatement.* Section 7 of the *Restatement* defines the two terms:

§ 7. Injury and Harm.

(2) The word "harm" is used throughout the Restatement [of Torts] to denote the existence of loss or detriment in fact of any kind to a person resulting from any cause.

(3) The words "physical harm" are used throughout the Restatement [of Torts] to denote the physical impairment of the human body, or of land and chattels.

Plaintiffs contend that since § 519 uses the word "harm" instead of the phrase "physical harm," economic losses must be included within the allowable recovery for strict liability ("One who carries on an abnormally dangerous activity is subject to liability for *harm* to the person, land or chattels of another resulting from the activity ...."). However, the court in *In Re TMI Litigation Governmental Entities Claims*, 544 F.Supp. 853 (M.D.Pa.1982), *vacated on other grounds, Pennsylvania v. General Public Utilities Corp.*, 710 F.2d 117 (3d Cir.1983) considered this very issue and held that § 519 of the *Restatement* requires physical harm or property damage to recover in strict liability. Judge Rambo specifically considered the scope of the term "harm" as used in § 519:

16. This case has taken on various names in its progression through the courts, the District and County Reporter reports the name as *Cipriani v. Sun Pipe Line Co.*

The statement of the law itself would seem to answer plaintiff's contention. Harm to "person, land or chattels" is a necessary element of the cause of action. Any additional damages, such as economic loss ... would have to flow from or be attendant upon the existence of one of the three enumerated harms.

*Id.* 544 F.Supp. at 858. Furthermore, it is not the possibility of economic harm which makes an activity such as blasting or storing hazardous waste dangerous; it is the possibility of physical harm. Thus, even if plaintiffs did state a claim for carrying on an abnormally dangerous activity, economic losses would still not be recoverable.

Accordingly, I find that plaintiffs cannot circumvent the economic loss doctrine by its allegations of strict liability based on an abnormally dangerous activity. Count III of the Complaint is dismissed altogether.

### 3. Allegations of Malicious, Wanton and Intentional Conduct

Plaintiffs argue that "[t]he law imposes a different scope of liability on defendants who intentionally engage in misconduct and does not require a showing of physical harm as a prerequisite to recovery." Plaintiffs' Memorandum at 40. Plaintiffs cite §§ 766, 766A and § 766B of the *Restatement* in support of this argument. These sections state, essentially, that intentional interference with the performance of a contract by a third person (§ 766), intentional interference with another's performance of his own contract (§ 766A), and intentional interference with prospective contractual relations (§ 766B) may subject the person who interferes with the contractual relations to liability for the resulting pecuniary loss.[17]

■ In order to state a prima facie case for interference with prospective contractual relations, a plaintiff must show a prospective contractual relationship, the purpose or intent to harm by preventing the relationship from occurring, the absence of privilege or justification and actual harm or damage as a result of the conduct. *Gordon v. Lancaster Osteopathic Hosp. Asso.*, 340 Pa.Super. 253, 489 A.2d 1364, 1370 (1985), *citing Glenn v. Point Park College*, 441 Pa. 474, 272 A.2d 895 (1971), quoting *Restatement* § 766. It is clear from these cases (both of which were cited by plaintiffs) that the "intentional" conduct required to state a claim for this cause of action is intentional interference with the contractual relationship, that is, the defendant must have an objective of interference. In *Gordon*, the court held that plaintiff did state a claim for intentional interference with prospective contractual relations; the defendant doctors had written letters to the executive board of the defendant hospital expressing a lack of confidence in the plaintiff doctor's abilities and their desire to replace him. By contrast, in *Glenn*, the defendant negotiated to buy a property directly from its owner after having learned the much of the necessary information from a real estate broker. The real estate broker, having been bypassed and thus denied a commission, sued for intentional interference with prospective contractual relations. The broker lost, in

---

**17.** *Restatement* §§ 766, 766A and 766B provide as follows:

§ 766. Intentional Interference with Performance of Contract by Third Person

One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

§ 766A. Intentional Interference with Another's Performance of His Own Contract

One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him.

§ 766B. Intentional Interference with Prospective Contractual Relation

One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the prospective relation.

part because they failed to allege defendant's specific intent to harm the broker. *Id.* 272 A.2d at 899. The court stated:

> It must be emphasized that the tort we are considering is an intentional one: the actor is acting as he does *for the purpose of causing harm* to the plaintiff ... The lower court stated in its opinion that 'There is no allegation that the defendant acted for specific purpose of causing harm to the plaintiffs.' We agree ... It thus does not meet the test of ... the Restatement.

*Id.* (emphasis in original).

■ As in the above cases, there is no allegation that the defendants acted with the intent to interfere with any contractual relations or the purpose of causing harm to the plaintiff. Plaintiffs have alleged that defendants, particularly the Owner/Manager Defendants, were willing to tolerate fire hazards in order to avoid the expense of upgrading the fire safety equipment, and that these defendants knew or should have known that a devastating fire was likely to occur. Despite plaintiffs' conclusory allegations that defendants' conduct was thus "intentional," this is not the same intent that is necessary to make out a prima facie case of intentional interference with contractual relations.

Additionally, it is interesting to note that the next section of the *Restatement,* sequentially, beyond the three sections plaintiffs cited in support of this argument, is § 766C, which, as stated above, expresses the general rule of the economic loss doctrine. The difference between §§ 766, 766A, 766B and 766C is the state of mind required to attach liability. Plaintiffs have not alleged the requisite state of mind to invoke §§ 766, 766A or 766B.

Accordingly, I find that plaintiffs cannot use this cause of action to circumvent the economic loss doctrine. Since plaintiffs did not assert this as a separate count, however, there is nothing to dismiss.

**4. Private Nuisance**

Plaintiffs assert that a private nuisance legal theory does not require physical harm to recover economic damages. Once again, plaintiffs rely on the *Restatement.* Section 822 states the elements of liability for private nuisance[18]:

> One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either
>
> (a) intentional and unreasonable, or
>
> (b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.

■ Plaintiffs offer the case of *Puritan Holding Co. v. Holloschitz,* 82 Misc.2d 905, 372 N.Y.S.2d 500, 501 (1975) in support of their argument that purely economic recovery is allowed despite the absence of physical injury in a cause of action for private nuisance ("Every person who suffered actual damages, whether direct or consequential, from a nuisance, might maintain an action for his own particular injury."). There is direct Pennsylvania authority to the contrary, however. *See, e.g., Moore v. Pavex, Inc.,* 356 Pa.Super. 50, 514 A.2d 137 (1986); *General Public Utilities v. Glass Kitchens of Lancaster, Inc.,* 374 Pa.Super. 203, 542 A.2d 567 (1988). In *Moore,* the Superior Court rejected plaintiff's claims that "the law of private nuisance supports their recovery for economic harm." *Moore,* 514 A.2d at 138. The court stated, generally, that "expectancies of liability cannot flow beyond the persons or property injured, for economic losses only, without creating interminable chains of remote consequences and imponderable issues of liability and damages." *Id.* 514 A.2d at 140. In *Glass Kitchens,* the court even more emphatically stated that "the general rule of law [is] that economic losses may not be recovered in *tort* absent any physical injury or property damage." 542 A.2d at 570 (emphasis added).

**18.** Pennsylvania has adopted this section. *See McQuilken v. A & R Dev. Corp.,* 576 F.Supp. 1023, 1029 (E.D.Pa.1983).

Most importantly, the arguments underlying Pennsylvania's adoption of the economic loss doctrine would be severely undermined if plaintiffs could circumvent the doctrine with creative pleading, such as the use of a private nuisance theory in lieu of negligence. The *Aikens* court discussed those underlying arguments:

[A]llowance of a cause of action for negligent interference with economic advantage would create an undue burden upon industrial freedom of action, and would create a disproportion between the large amount of damages that might be recovered and the extent of the defendant's fault. *See* Restatement (Second) of Torts Sec. 766C, comment a (1979). To allow a cause of action for negligent cause of purely economic loss would be to open the door to every person in the economic chain of the negligent person or business to bring a cause of action. Such an outstanding burden is clearly inappropriate and a danger to our economic system.

*Aikens,* 501 A.2d at 279. The logic of this rule does not change merely because the underlying tort is private nuisance instead of negligence.

■ Defendants also contend, correctly, that to recover for private nuisance the nuisance must be intentional or be "otherwise actionable" under theories of negligence, strict liability or reckless conduct. As discussed above, defendants' conduct was not intentional, and economic losses are not recoverable under negligence, strict liability or reckless conduct theories. Thus, on this threshold level, plaintiffs do not state a claim for recovery of economic losses under a private nuisance theory.

Additionally, defendants have raised the argument that plaintiffs do not allege a sufficient property interest to state a cause of action for private nuisance. Specifically, Dembowski, Grandy, Crumlish, Allen, Atlee and Triumphe do not allege any interest in real property. Plaintiffs argue that this ignores "the expansive view which both the *Restatement* and the courts of Pennsylvania

apply to the property interest requirement of private nuisance." Plaintiff's Memorandum at 68.

Section 821E of the *Restatement,* entitled "Who Can Recover for Private Nuisance," states:

For a private nuisance there is liability only to those who have property rights and privileges in respect to the use and enjoyment of the land affected, including

(a) possessors of the land,

(b) owners of easements and profits in the land, and

(c) owners of nonpossessory estates in the land that are detrimentally affected by interferences with its use and enjoyment.

Possessors of land are defined in Restatement § 328E [19], which reads:

§ 328E. Possessor of Land Defined.

A possessor of land is

(a) a person who is in occupation of the land with intent to control it, or

(b) a person who has been in occupation of land with intent to control it, if no other person has subsequently occupied it with intent to control it, or

(c) a person who is entitled to immediate occupation of the land, if no other person is in possession under Clauses (a) and (b).

The official comments to Restatement § 821E indicate that an individual with any possessory estate can recover in private nuisance (Comment (c)), that occupancy is a sufficient interest (Comment (d)), and that owners of an easement have a sufficient interest as well (Comment (e)).

■ Based on this analysis, plaintiffs assert that all plaintiffs who were landlords, tenants, sole proprietors, service contractors and even employees in the affected area had a sufficient degree of control over their work area to justify a claim in nuisance. *See* Plaintiff's Memorandum at 71 (analogizing employees to family members of possessors of land who qualify to bring a claim for nuisance as "occupants," as discussed in Comment (d) to Restatement § 821E).

---

**19.** This section has been adopted by Pennsylvania courts. *See Leichter v. Eastern Realty Co.,* 358 Pa.Super. 189, 192, 516 A.2d 1247, 1249 (1986).

There is nothing to indicate that Pennsylvania has adopted these sections of the *Restatement.* Furthermore, I do not believe that Pennsylvania courts would take such a broad view of "possessor of land." Accordingly, I hold that the only plaintiffs who have a sufficient interest in property to bring a private nuisance claim are Ejay, Regent Shoes, LegXpress, Square Corp., Vinciguerra, Corcoran, Sunshine, Royal Bank, Chris' Cafe and the Happy Rooster, as they all leased space which was allegedly the subject of the private nuisance. Nonetheless, these plaintiffs cannot recover for economic loss resulting from the nuisance. No other plaintiff has a sufficient interest in property and therefore none can bring a private nuisance claim at all.

### 5. Public Nuisance

Plaintiffs argue that the economic loss doctrine is a negligence concept which does not apply to claims of public nuisance. Section 821B of the *Restatement* defines public nuisance as follows: .

(1) A public nuisance is an unreasonable interference with a right common to the general public.

(2) Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:

(a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or

(b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or

(c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

█ It is clear that the economic loss doctrine is not applicable to public nuisance claims, but defendants contend that plaintiffs' public nuisance claim must be dismissed entirely because plaintiffs did not sustain any special or peculiar harm as a result of the nuisance. Section 821C of the *Restatement* states, in pertinent part:

In order to recover for damages in an individual action for public nuisance, one must have suffered a harm of a kind different from that suffered by other members of the public exercising the right common to the general public that was the subject of interference.

The Complaint alleges that "the right to use and safely traverse the public streets surrounding [One Meridian Plaza] is a right common to the general public," (¶ 257), and that this right was interfered with by defendants. The special or peculiar harm suffered by plaintiffs is described as "being deprived, and having their customers deprived, of safe, convenient and reasonable access to their business premises, and suffering pecuniary harm as a result of this deprivation." Plaintiffs' Memorandum at 71–72. This is allegedly different from the harm suffered by other members of the public because "[w]hile other members of the public were inconvenienced . . . they were not denied reasonable and safe access to their business premises, nor did they lose significant business because customers, upon whom their businesses depend, were deprived of convenient access to their business premises." Plaintiffs' Memorandum at 75.

Essentially, plaintiffs have two underlying bases for their assertion that they have suffered special harm: denial of access to land and pecuniary loss. In support of these two arguments, plaintiffs cite the following official comments to Restatement § 821C:

f. *Access to land.* The right of access to land, that is, the right of reasonable and convenient ingress and egress, is itself a property right in the land. If the public nuisance interferes with immediate ingress and egress to the plaintiff's land, the nuisance is a private as well as a public one and the harm suffered by plaintiff is particular harm differing in kind from that suffered by the general public, so that the plaintiff can recover for the public nuisance. . . .

h. *Pecuniary Loss.* Pecuniary loss to the plaintiff resulting from the public nuisance is normally a different kind of harm

from that suffered by the general public. A contractor who loses the benefits of a particular contract or is put to an additional expense in performing it because of the obstruction of a public highway preventing him from transporting the materials to the place of performance, can recover for public nuisance. The same is true when it can be shown with reasonable certainty that an established business has lost profits, as when the obstruction of the highway prevents a common carrier from operating buses over it or access to the plaintiff's place of business is made so inconvenient that customers do not come to it. If, however, the pecuniary loss is common to an entire community and the plaintiff suffers it only in a greater degree than others, it is not a different kind of harm and the plaintiff cannot recover for the invasion of the public right.

Plaintiffs also cite cases from various jurisdictions in support of their arguments. (Pennsylvania courts have never explicitly considered the issue.) In *The Stop & Shop Companies, Inc. v. Fisher*, 387 Mass. 889, 444 N.E.2d 368, 373 (1983), defendants negligently struck a bridge with their barge, resulting in the closing of the bridge for two months. Plaintiffs operated two stores at the end of the bridge, and as a result of the bridge closing, the stores suffered a substantial decline in business. The court held that the obstruction of a public way (the bridge) constituted a public nuisance, and that the harm plaintiff suffered was different in kind from that of the public, stating that "an established business may state a claim in nuisance for severe economic harm resulting from loss of access to its premises by its customers." *Id.* However, the court stated that "if a whole community suffers [severe pecuniary] loss, then it becomes a public wrong and the plaintiff cannot recover ... Thus the question becomes whether so many businesses have suffered the same economic harm that the plaintiff's damages are no longer special." *Id.* 444 N.E.2d at 373. The court continued that "[r]elief is warranted only where the plaintiff has suffered special pecuniary harm and substantial impairment of access." *Id.* 444 N.E.2d at 374.

In opposition to this argument, defendants cite *Nebraska Innkeepers, Inc. v. Pittsburgh–Des Moines Corp.*, 345 N.W.2d 124 (Iowa 1984). In this case also, plaintiffs brought an action sounding in negligence and public nuisance for economic losses due to the closing of a bridge allegedly caused by defendants' negligence. The action was brought by plaintiffs as a class action on behalf of themselves and all other persons connected with restaurants, bars, motels and other business establishments sustaining damages in the form of lost profits. The Iowa Supreme Court dismissed the plaintiffs' negligence claims, citing *Robins Dry Dock* and the economic loss doctrine. Regarding the public nuisance claim, the Court held that "the fact that plaintiffs assert this claim on behalf of the entire retail business communities of South Sioux City, Nebraska and Sioux City, Iowa implies that whatever damages have been suffered by plaintiffs have also been suffered by the entire business community and, therefore, such damages are *public* in nature rather than *special*." *Id.* 345 N.W.2d at 130 (emphasis in original).

It is clear that the special harm requirement is intended to serve the same purpose as the economic loss doctrine: to limit liability arising from an event. Public nuisances, by definition, affect many people. If every person or entity injured from a public nuisance could recover economic or even property damages, liability could be exorbitant; thus, only those plaintiffs who suffer special harm may recover. Defendants argue that because of that underlying policy, where there are numerous plaintiffs alleging the same harm, parties would be exposed to the same exorbitant liability if all of them could recover for economic harm, thus, no one plaintiff can establish special harm. They distinguish the cases plaintiffs have offered by submitting that none of them involved as many plaintiffs as the instant case.

██ I believe that the above cited cases and the *Restatement* are all in agreement: where there are a large number of plaintiffs, the harm those plaintiffs suffered is not special. Here, the number of established businesses which can show with reasonable certainty that they lost profits due to the closure

of the streets is undetermined, although the Complaint implies that the number may indeed be large. ("The number of the members of each class is so numerous that joinder of all members is impracticable." (¶ 42)). Furthermore, while plaintiffs have alleged a lack of access, they have not alleged a "substantial" lack of access, a requirement which I think is sound. A mere inconvenience could constitute a lack of access, but should not suffice to state a claim for public nuisance. The Complaint does not make clear exactly how long streets were closed, and how the closure specifically affected each plaintiff. I will grant those plaintiffs who may state a public nuisance claim leave to amend the Complaint in order to provide facts to establish that any lack of access was substantial.

As a matter of law I find that the only parties who may have suffered peculiar harm as a result of the closure of the streets due to the fire were those businesses who can show with reasonable certainty that they lost profits due to the closure of the streets and who suffered a substantial lack of access. The plaintiffs who may continue to assert this cause of action are Ejay, Regent Shoes, LegXpress, Square Corp., Vinciguerra, Corcoran, Sunshine, Royal Bank, Chris' Cafe and the Happy Rooster. These plaintiffs may amend the public nuisance count within twenty days to conform to this opinion. All other plaintiffs were not uniquely affected by the closure of the streets, and inclusion of these parties would increase the number of plaintiffs so as to generalize the harm. Therefore, all other plaintiffs' claims for public nuisance are dismissed. It will be determined at a later stage of the proceeding whether the number of plaintiffs is too large to permit recovery, and which plaintiffs suffered severe economic harm and a substantial lack of access.

### 6. Trespass

Plaintiffs argue that the economic loss doctrine is not applicable to trespass. Defendants argue that trespass is an intentional tort and since the Complaint alleges only negligent conduct, the trespass count must be dismissed. Plaintiffs counter that they do allege intentional conduct, and, alternatively, that trespass may be established by a negligent or reckless invasion of land. The trespass claim here is that, as a result of defendants' conduct, a "substantial physical invasion" resulted and "substantial smoke, airborne toxins, water and falling granite" or other debris and barriers were placed on the property of certain plaintiffs.

■ Under Pennsylvania law, trespass to land is an intentional tort, and there must be an "intention to enter upon the particular piece of land in question." *Valley Forge Gardens, Inc. v. James D. Morrissey, Inc.,* 385 Pa. 477, 483, 123 A.2d 888, 891 (1956), quoting *Restatement* § 163, comment b. The key inquiry here is the definition of intent. Defendants argue that in order to state a claim for trespass, a defendant must intend the intrusion, although the defendant need not intend the harmful consequences. W. Keeton, et al., *Prosser and Keeton On The Law of Torts,* § 13 at 73 (5th ed. 1984). Plaintiffs assert that it is sufficient if defendants knew their conduct was substantially certain to result in such an invasion. *See Buckley Motors, Inc. v. Amp, Inc.,* 23 Pa.D. & C.2d 324, 328 (1960) (citing to *Restatement* § 163, comment c). Furthermore, plaintiffs assert that they can recover under either of two other *Restatement* sections: § 165, Liability for Intrusions Resulting From Reckless or Negligent Conduct and Abnormally Dangerous Activities, whereby one who recklessly or negligently causes a thing to enter onto the land of another is subject to liability if the thing causes harm to the land or the possessor; and § 931, Detention or Preventing Use of Land or Chattels, which states that "[i]f one is entitled to a judgement for the detention of, or for preventing the use of land or chattels, the damages include compensation for . . . the value of the use during the period of detention or prevention or the value of the use or the amount paid for a substitute. . . ."

Furthermore, plaintiffs argue that even if intentional conduct is required, they have adequately alleged intentional conduct. They claim that defendants acted "intentionally" in failing to properly maintain and operate the Building's fire suppression and pro-

tection systems. Plaintiffs also argue that if intent means that defendants know the invasion is "substantially certain" to result, that defendants "knew or should have known that such failure would result in grave and extensive harm to plaintiffs' property" (essentially, that defendants knew their conduct was substantially certain to produce such a result). I do not believe that the underlying facts of the Complaint support plaintiffs' conclusory statements regarding intent. The Complaint suggests that defendants chose to assume the risks of fire in order to save money by not properly maintaining and operating the Building's fire suppression and protection systems. This is a far cry from being "substantially certain" that a devastating fire would occur.

 I also find that reckless and/or negligent conduct is not sufficient to state a cause of action for trespass. The only Pennsylvania decision incorporating either of the two *Restatement* sections upon which plaintiffs rely is *Glass v. Dean Coal Co.*, 7 Pa.D. & C.2d 657, 659 (1956) (citing to *Restatement* § 931). *See also Apartment Owners and Managers Committee v. Brown*, 252 Pa.Super. 539, 382 A.2d 473, 480 (dissenting opinion) (citing to *Restatement* § 931 for the measure of damages for tortious detention of a chattel). Furthermore, § 931 is merely a measure of damages; the underlying tort is "tortious conduct [which] has prevented the owner from using the land, as when the defendant by acts on his own land has made the use of the plaintiff's land dangerous or unhealthful." *Restatement* § 931, comment a. There is not a sufficient indication that Pennsylvania courts, if confronted with the question today, would allow plaintiffs to state a cause of action based on either of these sections.

 Furthermore, defendants argue that even if a trespass claim could be based upon negligence, pure economic losses would still not be available in this case. A trespasser is liable not only for personal injuries resulting directly and proximately from the trespass but also for those which are indirect and consequential. *Kopka v. Bell Tel. Co.*, 371 Pa. 444, 451, 91 A.2d 232 (1952); *See also Northeast Women's Center, Inc. v. McMona-*

*gle*, 689 F.Supp. 465, 477 (E.D.Pa.1988), *aff'd*, 868 F.2d 1342 (3d Cir.1989). Applying this measure of damages, plaintiffs in this case are not entitled to recover for economic losses unless there is a causal nexus between the trespass and the economic loss. That there is no such connection alleged is discussed *infra* in section 7 of this opinion on the relationship between physical damage and economic harm. If this cause of action were otherwise viable, plaintiffs would be given an opportunity to amend the Complaint and meet this requirement. Due to the ultimate disposition of this count, however, the measure of damages is immaterial.

Accordingly, plaintiffs' Count VI for trespass is dismissed with prejudice.

### 7. Negligence Claims Without Allegations of Physical Harm

Plaintiffs argue that they state a negligence claim for the recovery of their economic losses even in the absence of physical harm. Their efforts to exclude the case at bar from the economic loss doctrine are based on two arguments. First, plaintiffs attempt to distinguish the principal Pennsylvania cases regarding the economic loss doctrine, namely *Aikens v. Baltimore and Ohio R. Co.* and *Moore v. Pavex*, by asserting that those cases did not involve economic losses suffered as a direct and immediate result of a governmental evacuation, or where there is a threat of physical harm. Second, plaintiffs argue that the two Supreme Court cases (*Robins Dry Dock* and *East River Steamship*) are inapplicable to the instant case because those decisions rested upon contractual privity.

The *Moore* case, discussed above in the section of this opinion on the economic loss doctrine generally, involved the rupture of a water main by a construction worker using a jackhammer. The Superior Court rejected plaintiffs' claims for economic losses, citing the lack of physical harm. However, the opinion contains language which could be read to imply that if economic losses were foreseeable, such as those arising from a nuclear fallout, or if they were suffered because of the threat of physical harm, they

would be recoverable despite the absence of physical damage:

> The injury [from a nuclear fallout], while not always immediately ascertainable, is direct and predictable, and for persons not to move immediately from a fallout zone to avoid possible incredible consequences, is folly and unsupportable [sic]. Any economic loss resulting from such a scenario is directly attributable to the meltdown ... This is no mere rupture of a waterpipe. It is clearly distinguishable.

*Moore*, 514 A.2d at 140.

Plaintiffs interpret this language as permitting recovery for economic losses where the losses suffered are direct and predictable, and where the loss was accompanied by serious risks of health and safety, such as here. Plaintiffs' Memorandum at 53–54. Plaintiffs also point out that neither *Moore* nor *Aikens* involved such a situation, so the cases are not inconsistent with their argument and are distinguishable from the instant case.

The Superior Court retreated from its position in *Moore*, or at least explained it, in *Glass Kitchens*, 542 A.2d 567. While this case did not involve a "meltdown," it did involve a nuclear accident. The court did "not decide whether a different rule of tort law will ever be applied in the context of a nuclear incident," but it did apply "traditional rules of [our] tort law" to the parties in the case. *Id.* at 571 n. 7. More importantly, it explained the above language in *Moore* not as suggesting the possibility of recovery for economic loss without physical harm but instead that

> [T]his language from *Moore* is consistent with the rule of law we announced in *Aikens*. These statements recognize that persons or property who have come in contact with radiation or fallout will suffer a direct and predictable **actual** injury, despite the fact that this injury may not be visible to the naked eye.

*Id.* 542 A.2d at 571 (emphasis added).

Based on this analysis, I find that Pennsylvania has not recognized an exception to the economic loss doctrine for situations like the fire at One Meridian Plaza.

The narrow exception which *Moore* suggested has apparently been rejected in *Glass Kitchens*. Plaintiffs' suggested exception, that economic losses be recoverable where accompanied by the mere threat of physical harm, goes beyond the *Moore* dicta. This exception would also be at odds with the underlying reasoning behind the economic loss doctrine; it would be anomalous if a rule of law which is used to limit liability were discarded in calamitous situations where liability would be greatest. Furthermore, the bright line which determines who may pursue a negligence action would become less bright when attempting to determine exactly what constitutes a threat of harm.

Plaintiffs' attempts to distinguish the Supreme Court cases, *Robins Dry Dock* and *East River Steamship*, are equally unavailing. The only relevance of these cases to the case at bar is the philosophical underpinnings of the economic loss doctrine. The holding in this case rests on Pennsylvania law only. Plaintiffs contend that the two Supreme Court cases were decided based on principles of contractual privity, and, consequently, are readily distinguishable from the present one. While the Court does, in both cases, discuss contractual privity, the economic loss doctrine as it exists today is based on broader grounds than the availability of insurance or the integrity of contract principles. It is based on the desire for and necessity of a bright line rule to limit liability in situations where many parties have been harmed and liability could be almost limitless. The rule of law as it exists in Pennsylvania is not based upon any considerations of contractual privity.

Consequently, I find that for those plaintiffs who brought a claim for negligence but did not allege property damage, namely Triumphe and Sunshine, claims for economic losses based on negligence must be dismissed.

### 8. Relationship Between Physical Damage and Economic Harm

Perhaps defendants' most important argument is that, in order to recover economic losses, the economic loss must flow directly from the physical harm to plaintiffs' proper-

ty. Since no plaintiff alleged this causal connection, if defendants' statement of the law is correct, all plaintiffs' claims for economic losses must be dismissed.

Plaintiffs argue that no causal connection is necessary. First, they offer official comment (b) to *Restatement* § 766C:

> b. *Physical harm to the other.* The rule stated in this Section applies when the plaintiff suffers only pecuniary loss, such as the loss of the financial benefits of a contract or of prospective trade or financial loss through being put to additional expense. If there is physical harm to the person or land or chattels of the plaintiff, the rule stated in this Section does not apply and there may be recovery for negligence that results in physical harm because of the nonperformance of a contract with the plaintiff. (Cf. §§ 435B, 499). This recovery is of course subject to the usual rules governing liability for negligence. When recovery is allowed, the loss of expected profits or other pecuniary loss may, in an appropriate case, be recovered as "parasitic" compensatory damages.

Plaintiffs attach significance to this language, which does not clearly require a causal connection between the physical harm and the economic loss. Furthermore, plaintiffs claim that requiring a correlation between the harm and the loss would contravene an underlying purpose of the economic loss doctrine, which is to establish a bright line rule separating those who may recover for economic loss in a given situation from those who may not. Plaintiffs argue that if the court must make this two pronged analysis (whether there was physical harm at all, and whether the physical harm is the cause of the economic loss), the pragmatism of the rule would be lost.

■ Defendants, on the other hand, argue that plaintiffs' position is inconsistent with fundamental principles of causation. They argue that if liability is imposed on a party for physical harm, that party is responsible only for those losses directly and proximately resulting from the harm. This, however, begs the question of whether plaintiffs' economic harm was proximately caused by defendants' negligence. The principle of proximate causation has been supplanted by the economic loss doctrine in situations where a defendant's negligence causes purely economic loss. Ordinarily, liability is determined by foreseeability. Nonetheless, the economic loss doctrine precludes recovery for economic loss where there has been no physical harm suffered, even where the economic loss was foreseeable. *See, e.g., Dundee Cement Co. v. Chemical Laboratories, Inc.,* 712 F.2d 1166, 1168 (7th Cir.1983), where a truck owned by the defendant overturned and spilled a flammable liquid onto a highway. As a result of the spill, the highway was closed for some time and access to plaintiff cement company was completely blocked. The court stated that "[t]he causal relation between the [negligence] and the loss of business is direct . . . [O]ne could easily foresee that an accident that forced a road to close and that therefore blocked all access to a company could seriously inconvenience that company . . ." Nonetheless, the plaintiff was deemed "too remote . . . because it was not physically harmed." *Id.* In *Margolis v. Jackson,* 375 Pa.Super. 182, 185, 543 A.2d 1238, 1240 (1988) the court stated that economic loss "is considered beyond the scope of recovery even if a direct result of the negligent act." It is clear that ordinary causation principles do not apply in this case.

More persuasive, however, is defendants' reasoning describing plaintiffs' interpretation of the physical harm requirement as a "trigger" mechanism. According to plaintiffs, pleading property damage of any kind is sufficient to open the door to recovery for economic loss. To illustrate the disparate effects of the operation of such a rule, defendants offer the following hypothetical:

> [A]ssume two of the 2,500 employees in One Meridian Plaza who are pleaded to have lost their jobs because of the fire had identical jobs with identical claims for lost wages and benefits; employee A left no personal items at the office during the weekend of the fire and employee B left her coat in a closet. Under *Aikens,* Employee A cannot recover his lost wages. It would be absurd to hold that because employee B's coat was damaged she is enti-

tled to now recover the lost wages barred to employee A.

E/R Defendants' Memorandum at 31–32.

In the only Pennsylvania case mentioning the issue, the court in *Mueller v. Pennsylvania Gas Co.*, 54 Erie Co. Legal J. 1 (Erie Co.1970), *aff'd*, 218 Pa.Super. 923, 279 A.2d 281 (1971), without discussion, stated that recovery for economic loss "is limited to those who have suffered injuries or damage to property which directly results in loss to the owner [of the property]." *Id.* at 9.

■■■ A rule requiring some nexus between the physical harm and the economic loss is a wiser, more equitable rule than merely using physical harm as a trigger to recovery for economic loss. Courts are well-equipped to make such causation determinations, and I believe that Pennsylvania courts would require a connection between the physical harm and the economic loss. The *Restatement* comment relating to "parasitic" damages does not support plaintiffs' interpretation; in fact, it does the opposite. "Parasitic" implies a "symbiotic relationship" and this implies that damages for economic harm must be dependent upon the physical harm to be recoverable. *See In Re TMI Litigation Governmental Entities Claims,* 544 F.Supp. 853, 858 (M.D.Pa.1982), *vacated on other grounds, Pennsylvania v. General Public Utilities Corp.,* 710 F.2d 117 (3d Cir. 1983).

Furthermore, allowing plaintiffs to recover economic losses upon any showing of physical harm would open the door to a vast number of fraudulent claims. For example, many employees in the above hypothetical would undoubtedly claim that they too had left a coat in the closet. A requirement of some nexus between the physical harm and the economic loss largely prevents that possibility.

For purposes of the case at bar, this means that since none of the plaintiffs have adequately pleaded a causal relationship between the physical harm alleged and the economic losses suffered, all claims for economic losses deriving from Counts I and II for negligence must be dismissed. However, plaintiffs will be given twenty (20) days to amend the Complaint and plead sufficient facts to comply with this requirement. If plaintiffs cannot properly allege this connection, all claims for economic damages will be dismissed with prejudice.

*9. Water, Smoke, Toxins, Debris, Odors and Lack of Access as Physical Harm*

Defendants maintain that those plaintiffs who have alleged that their property was touched and physically invaded by smoke, water, airborne toxins, debris, or to whose property access was denied due to the closure of the streets, have not alleged physical harm as contemplated by the economic loss doctrine and thus these plaintiffs' claims for economic loss must be dismissed. Specifically, Vinciguerra, Corcoran, Chris' Cafe and the Happy Rooster allege physical harm in this way.[20] Plaintiffs, of course, insist that the damage so alleged is sufficient, or that it is a factual matter not suitable for resolution in a motion to dismiss.

Both sides have cited *Pennsylvania v. General Public Utilities Corp.,* 710 F.2d 117 (3d Cir.1983) in support of their arguments. In that case, plaintiffs argued that radioactive materials emitted during the nuclear incident at Three Mile Island permeated the entire area and constituted a physical intrusion upon the plaintiffs' properties, and that this intrusion is a sufficient showing of physical harm to permit plaintiffs to recover economic losses.[21] *Id.* at 122. The Court of Appeals held that these allegations were sufficient to defeat a motion for summary judgment or a motion to dismiss. Defendants argue that the remaining issue of fact was whether the exposure to radiation actually resulted in property damage. Plaintiffs con-

---

**20.** Since the Happy Rooster brought a claim for public nuisance only, this issue is immaterial to it.

**21.** This issue turned on the interpretation of the term "damage to property" as that term is used within the definition of "nuclear incident" in the Atomic Energy Act of 1954, 42 U.S.C. § 2011 *et seq.*, as amended by the Price–Anderson Act of September 2, 1957, Pub.L. 85–256, 71 Stat. 576, § 2014(q). Nonetheless, the discussion is still pertinent.

tend that the Court's holding indicates that the emanation of radioactive materials, analogous to the toxins and debris from One Meridian, can suffice as physical harm.

■ This issue is intertwined with the issue of whether the physical harm must cause the economic loss in order to recover for economic loss, discussed above. If the alleged "physical invasion" of smoke, water, odor, debris or toxins caused the economic loss, they are sufficient to be "physical harm." Thus, Vinciguerra, Corcoran and Chris' Cafe may recover for economic loss if they can adequately plead this causal link. Otherwise, these plaintiffs' claims for economic loss will be dismissed.

■ Defendants also assert that denial of access due to the closing of the streets or barricades is not "physical harm." In *Getty Refining & Marketing Co. v. MT Fadi B*, 766 F.2d 829, 834 (3d Cir.1985), the Third Circuit Court of Appeals was confronted with the question of whether a denial of access to navigable water immediately in front of plaintiff's property was physical harm sufficient to permit economic recovery. The court held that this did not constitute physical damage. *Id.* In *Dundee Cement Co. v. Chemical Laboratories, Inc.*, 712 F.2d 1166, 1168 (7th Cir.1983), discussed above, plaintiff cement company was closed due to defendant's negligence which caused a highway to be closed and access to plaintiff company to be blocked. Plaintiff sued in negligence for its lost profits, and the Court of Appeals affirmed the dismissal of plaintiff's claims since plaintiff suffered no physical injury.

As a practical matter, "physical harm" suggests some physical contact or damage. Denial of access does not fit within this standard. Thus, I find that those plaintiffs who have alleged denial of access or barriers to property do not satisfy the physical harm requirement by so alleging and cannot recover purely economic losses in negligence without some tangible, physical harm. Thus, even if the denial of access caused the economic loss, the loss is not recoverable in negligence absent some other showing of physical harm (which caused the economic loss).

### 10. Conclusion

As a result of this section of this opinion pertaining to the economic loss doctrine, all plaintiffs' claims for economic losses are dismissed with prejudice, except for the following:

1. Those plaintiffs who brought a cause of action for negligence and pleaded some form of physical harm, namely Ejay, Dembowski, Grandy, Crumlish, Allen, Regent Shoes, Vinciguerra, Corcoran, Royal Bank and Atlee may replead their allegations of physical harm and economic loss, in conformance with this opinion, if and only if they can allege a causal connection between the two, within the context of the negligence count.

2. Ejay, Regent Shoes, LegXpress, Square Corp., Vinciguerra, Corcoran, Sunshine, Royal Bank, Chris' Cafe and the Happy Rooster may replead a count for public nuisance, in conformance with this opinion, if and only if they can allege a substantial impairment of access in addition to severe pecuniary loss.

### C. Plaintiffs' Lack of Standing and/or Prematurity of Their Claims

Defendants argue that "presumably some or all of the would-be class members are insured under policies of property damage and/or business interruption insurance which provided coverage for losses sustained in the fire." *See, e.g.*, Delmont's Memorandum at 10. They argue that absent allegations that plaintiffs have already presented such claims and have recovered less than the full amount of their losses, plaintiffs cannot demonstrate that they have actually suffered an uninsured loss and the claims are "premature." Alternatively, they argue that the insurance carriers, and not the plaintiffs, are the "real parties at interest."

In a motion to dismiss, the court must draw all reasonable inferences from the allegations and view them in a light most favorable to the non-moving party. That plaintiffs have actually suffered an uninsured loss is a logical inference one can draw from plaintiff's allegations that they have suffered an uninsured loss. Defendants' arguments in this

regard are better suited to a motion for summary judgment.

### D. Inclusion of Irrelevant and Impertinent Matters

Rule 12(f) of the Federal Rules of Civil Procedure authorizes a court to strike from a pleading any insufficient defense or any redundant, immaterial, impertinent or scandalous matter. However, motions to strike are "disfavored, especially in the absence of prejudice." *See, e.g., J & A Realty v. Asbury Park,* 763 F.Supp. 85 (D.N.J.1991).

■ Defendants have identified three categories of allegations which they contend should be stricken. First, three firefighters were killed during the fire at One Meridian which is the subject of this litigation. Despite the fact that none of the plaintiff classes include Philadelphia firefighters and that plaintiffs do not assert claims for wrongful death or personal injury, the Complaint repeatedly makes reference to the firefighters and the dangers encountered by those fighting the fire. Second, the Complaint repeatedly refers to statements made by the Philadelphia Fire Commissioner and Fire Marshall. Press reports are also cited. Finally, the Complaint contains a variety of colorful statements. For example, the Building is referred to as a "towering inferno" and the fire is described as having "roared" through the roof.

I agree that references to the firefighters' deaths and statements made by public officials and the press are immaterial and are hereby stricken.

### E. Failure to State a Claim for Punitive Damages

Several defendants have argued that the Complaint fails to allege facts which support a cause of action for punitive damages against them. They contend that plaintiffs have inserted conclusory allegations for punitive damages in the Complaint without a sufficient set of facts to support them.

■ Under Pennsylvania law, punitive damages are awarded to punish outrageous conduct. *Olsen v. United States,* 521 F.Supp. 59 (E.D.Pa.1981), *aff'd sub nom, Ford Motor Company v. Cooper,* 688 F.2d 820 and 688 F.2d 823 (3d Cir.), *cert. denied,* 459 U.S. 1107, 103 S.Ct. 732, 74 L.Ed.2d 956 (1982). Plaintiffs must establish that defendants' acts were outrageous because of the defendants' evil motive or their reckless indifference to the rights of others. *Feld v. Merriam,* 506 Pa. 383, 485 A.2d 742, 747 (1984) (adopting *Restatement* (Second) of Torts § 908(2)). The act must be intentional, reckless or malicious. *Id.* 485 A.2d at 748. In deciding whether to impose punitive damages, a court should not look at the end result, but rather should examine the actor's conduct. *Id.* It is not sufficient that the defendant failed to appreciate a risk; rather, there must be indifference to a known risk. *SHV Coal, Inc. v. Continental Grain Co.,* 526 Pa. 489, 587 A.2d 702 (1991).

Generally, plaintiffs allege that some defendants knew of the inadequacies of the equipment and fire detection and suppression systems and products before the fire, and that the failure to rectify the situation showed reckless indifference to the plaintiffs' interests. The allegations against each defendant must be analyzed against this standard to determine whether the Complaint contains sufficient facts to support a demand for punitive damages.

#### 1. Delmont

■ The Complaint specifically alleges that Delmont knew or should have known that the Building's standpipe system, pumps and the reducing valves were installed improperly and negligently. (¶ 100).[22] I cannot say as a matter of law that Delmont's conduct, if proven as alleged in the Complaint, was not "outrageous" so as to support an award of punitive damages. Accordingly, Delmont's motion to dismiss plaintiffs' counts for punitive damages is denied.

#### 2. E/R Defendants

■ The Complaint alleges that the Owner/Manager Defendants knew that there was

---

**22.** This paragraph makes the same allegations against the Owner/Manager Defendants and Penn Sprinkler. Penn Sprinkler did not move to dismiss the punitive damage claims.

inadequate water pressure in the standpipe system on several floors prior to the fire (¶ 97), knew or should have known that the Building's standpipe system, pumps and the reducing valves were installed improperly and negligently (¶ 100), knew that on February 14, 1991, there was no water pressure in the bathrooms or kitchens of the 17th and 18th floors of the Building (¶ 123), and knew on Friday, February 22, 1991, the day before the fire, that the public Concourse adjacent to the basement of the Building was flooded by water (¶ 124). A number of other allegations raise the inference that the Owner/Manager Defendants were unconcerned with the fire protection and suppression systems, choosing instead, for example, to make aesthetic and cosmetic changes to the Building. (¶ 114). I cannot say as a matter of law that the E/R Defendants' conduct, if proven as alleged in the Complaint, was not "outrageous" so as to support an award of punitive damages. Accordingly, the E/R Defendants' motion to dismiss plaintiffs' counts for punitive damages is denied.

### 3. Griffin and Balis

[29] Plaintiffs' allegations against Balis and Griffin are related to their failure to "segregate, store and safekeep flammable and combustible liquids, finishes and other materials and conditions tending to create fire hazards." (¶ 131). These allegations involve purely negligent conduct which does not support a claim for punitive damages. *See McDaniel v. Merck, Sharp & Dohme,* 367 Pa.Super. 600, 533 A.2d 436, 447–48 (1987), *app. den.,* 520 Pa. 589, 551 A.2d 215 (1988) and *app. den., Petition of Merck, Sharp & Dohme,* 520 Pa. 589, 551 A.2d 216 (1988) (dismissing punitive damage claims against defendants where only facts alleged against them constituted ordinary negligence). Thus, claims for punitive damages against defendants Griffin and Balis are dismissed.

### 4. ABM

 Allegations against ABM also simply amount to negligence. The Complaint alleges that personnel on duty the night of the fire were inadequately trained (¶ 56), that ABM employees failed to investigate a strong odor on the 22nd floor (¶ 134–135), that an ABM employee improperly used an elevator to determine if there was a fire on the 22nd floor (¶ 143) and ABM employees failed to notify the Philadelphia Fire Department that there was a fire in the Building (¶ 147). There are no allegations against ABM regarding, for example, prior knowledge of dangerous conditions. The allegations against ABM are not sufficient to support an award of punitive damages. Accordingly, punitive damage claims against ABM are dismissed.

### 5. National Guardian

The allegations against National Guardian are that they failed to respond to the fire alarm call and/or that they installed, maintained, and/or inspected the failed automatic dialer located in the basement of One Meridian Plaza on the night of the fire. Without more information as to the circumstances surrounding the failure to respond to the fire alarm call, I cannot say that National Guardian's conduct was not "outrageous." National Guardian's motion to dismiss punitive damage claims against it is denied.

### 6. Rodin

Since Rodin is an Owner/Manager Defendant, the above section pertaining to the E/R Defendants applies equally to Rodin.[23] Thus, Rodin's motion to dismiss plaintiffs' claims for punitive damages is denied.

### F. Failure to State a Claim for Attorneys' Fees

 Defendants argue that plaintiffs have "alleged no basis in fact or in law, nor does one exist, that would permit an award of attorneys' fees on the causes of action alleged and the claims for such should be dismissed." Delmont's Memorandum at 13. Plaintiffs counter that where, as here, plaintiffs seek the creation of a fund by judgment, the pre-

---

**23.** Unlike ABM, Rodin has not moved to segregate itself from the classification of "Owner/Manager Defendants" in the Complaint, and I will not infer the distinction merely because they filed a separate motion to dismiss.

vailing class may be awarded attorneys' fees. *See Boeing Co. v. Van Gemert,* 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980). A fund by judgment is a fund recovered by a litigant or a lawyer for the benefit of someone other than himself or his client. *Id.* at 478, 100 S.Ct. at 749. The common fund doctrine arose from the perception that persons who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched at the successful litigant's expense. *Id.* at 478, 100 S.Ct. at 749. This inequity can be prevented by assessing attorneys' fees against the fund. However, the defendant cannot be obliged to pay fees awarded to the class lawyers. *Id.* at 482, 100 S.Ct. at 751. Thus, plaintiffs' request for attorneys' fees is not really from the defendants but from a fund for judgment, if one ever arises. Plaintiffs' demand for attorneys' fees is not appropriate in the Complaint, and thus I grant defendants' motion to dismiss plaintiffs' claims for attorneys' fees, without prejudice to recover same in accordance with the above statement of the law.

### G. Motion for a More Definite Statement

■ Defendants have moved under Fed. R.Civ.P. 12(e)[24] for a more definite statement. Specifically, Delmont argues that references throughout the complaint to "defendants" are unclear and leave each defendant guessing as to which defendant that allegation refers. Plaintiffs respond that the Complaint clearly states that "unless otherwise indicated the term 'defendants' refers to all of the above-named defendants." I believe that this definition of "defendants" is sufficiently clear to allow the defendants to answer. If a defendant was not involved in the events which form the allegations within a paragraph of the Complaint, that defendant should appropriately respond to that paragraph in its answer. Furthermore, this opinion will clarify which causes of action remain

against each defendant. Defendants' motion for a more definite statement is denied.

### H. Negligence Per Se

Defendants argue that Count I of the Complaint, alleging Negligence Per Se, should be stricken or dismissed as it does not constitute a separate cause of action but is merely an evidentiary doctrine, and that it is duplicative of the general assertions of negligence contained in Count II. This count alleges violations of the Philadelphia Code, a municipal ordinance the violation of which, defendants contend, is not sufficient to establish negligence per se.

■ Negligence per se is a concept which permits a party to carry its burden of proving negligence by establishing conduct violative of a statute or similar enactment. *White v. Southeastern Pennsylvania Transp. Authority,* 359 Pa.Super. 123, 135, 518 A.2d 810, 816 (1986). The party must also show:

1) that the statute was intended to protect the plaintiff as an individual; 2) that the type of harm sustained was the type against which the legislature intended to prevent; 3) that the type of hazard or danger which caused the harm was a danger which the legislature intended to prevent, and 4) that the violation was the legal cause of the injury.

*Villaume v. Kaufman,* 379 Pa.Super. 561, 566, 550 A.2d 793, 796 (1988).

In *Philadelphia v. Stepan Chemical Co.,* 544 F.Supp. 1135, 1154 (E.D.Pa.1982) the District Court, in dicta, stated that violations of the Philadelphia Code may permit a finding of negligence per se. In *Githens, Rexsamer & Co. v. Wildstein,* 443 Pa. 480, 277 A.2d 157, 158 (1971), the court held that a violation of the Philadelphia Fire Code did not establish negligence since the plaintiff could not show a causal connection between the violation and the spread of the fire which

---

**24.** Fed.R.Civ.P. 12(e) states:

**Motion for More Definite Statement.** If a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading. The motion shall point

out the defects complained of and the details desired. If the motion is granted and the order of the court is not obeyed within 10 days after notice of the order or within such other time as the court may fix, the court may strike the pleading to which the motion was directed or make such order as it deems just.

damaged plaintiff's property. However, this suggests that if plaintiff could prove causation, the fire code violation would be enough to establish negligence.

■ Defendants have cited several cases which, they claim, hold that violation of a municipal ordinance does not create a factual basis for negligence per se. *See, e.g., Jinks v. Currie,* 324 Pa. 532, 538, 188 A. 356 (1936); *Wisniewski v. Chestnut Hill Hospital,* 403 Pa. 610, 170 A.2d 595, 596 n. 1 (1961). More recent decisions, however, indicate more clearly that violation of municipal ordinances may indeed be the basis of negligence per se.

■ Defendants also argue that the negligence per se count, if not dismissed, would permit plaintiffs to recover in what amounts to strict liability. This argument is resolved by the causation requirement; there is certainly no liability without fault. To recover on this negligence theory, plaintiffs must prove far more then a mere violation of the Code; they must prove causation. *See, e.g., White* ("The violation must be the legal cause of the injury.")

■ Based on the foregoing, I find that negligence per se may be based on violations of the Philadelphia Code. Furthermore, I believe that negligence based on violation of the Philadelphia Code may be separate and distinct from negligence based on breach of some other duty since the liability flowing from the violation of the Code is limited to damages proximately caused by the violation, while the "other" negligence may have proximately caused other damage. Accordingly, defendants' motion to dismiss Count I of the Complaint is denied.

## I. Lack of Jurisdiction

ABP argues that this court lacks personal and subject matter jurisdiction over it. This issue has been resolved in an order dated January 26, 1993, denying ABP's motion to dismiss on the same grounds in a related case before this court, *Federal Insurance Co. v. Richard I. Rubin & Co., Inc.,* Civil Action No. 92–4177, 1993 WL 21327. Thus, ABP's

motion to dismiss on these jurisdictional grounds is denied.

## J. Impermissible Split of Causes of Action

Defendants [25] argue that plaintiffs have impermissibly split their causes of action in seeking only uninsured damages and/or losses. (¶ 225). In its reply memorandum, Balis has attempted to explain its position:

> Balis' contention is simply that if the plaintiffs persist in pursuing their uninsured losses only, a subsequent suit by the plaintiffs or their insurers to recover the insured loss will be barred ... The plaintiffs may pursue a claim for uninsured losses only, but when they do so they foreclose the rights of their insurers as subrogees.

Balis' Reply Memorandum at 28.

If that is Balis' argument, it is inappropriately raised in these proceedings. If Balis wishes to raise this argument in a case for those insured losses, they are welcome to do so.

[37] Moreover, Balis has cited several Pennsylvania cases in support of this argument. *See Spinelli v. Maxwell,* 430 Pa. 478, 243 A.2d 425, 427 (1968); *see also Travelers Ins. Co. v. Hartford Acc. & Indem. Co.,* 222 Pa.Super. 546, 294 A.2d 913, 915 (1972). In federal court, procedural issues such as joinder of parties are subject to federal law and the Federal Rules of Civil Procedure, not state law. *See St. Paul Fire & Marine Insurance Co. v. Peoples Natural Gas Co.,* 166 F.Supp. 11 (W.D.Pa.1958) (The question of whether a partial subrogee may maintain an action in a federal court alone without joining other real parties in interest is a procedural question covered by the Federal Rules of Civil Procedure and must be answered in the affirmative ... Defendants are protected from a multiplicity of suits by its opportunity to join the necessary parties). *See also Royal Indemnity Co. v. Erie,* 326 F.Supp. 571 (W.D.Pa.1971) ("Regardless of what Pennsylvania rule may be with respect

---

**25.** Defendants Balis and ABM raised this argument, but only Balis discussed it in its memorandum (and reply memorandum).

to splitting causes of action," a partial subrogee alone may bring suit against tortfeasor.)

Defendants' motion to dismiss on this ground is denied.

### V. *Conclusion*

Based on the foregoing, Count III for Strict Liability—Ultrahazardous Activity and Count IV for trespass are dismissed in their entirety. Count V for private nuisance is dismissed with prejudice against the following plaintiffs: Dembowski, Grandy, Crumlish, Allen, Atlee and Triumphe, and all claims for private nuisance, insofar as they demand damages for economic loss, are dismissed with prejudice. Count VI for public nuisance is dismissed with prejudice against the following plaintiffs: Dembowski, Grandy, Crumlish, Allen, Atlee and Triumphe. Count VI for public nuisance is dismissed without prejudice against the following plaintiffs, with leave to amend within twenty (20) days in conformance with this opinion: Ejay, Regent Shoes, LegXpress, Square Corp., Vinciguerra, Corcoran, Sunshine, Royal Bank, Chris' Cafe and the Happy Rooster. Claims for economic loss grounded in negligence are dismissed, with prejudice, against the following plaintiffs: Triumphe and Sunshine. Claims for economic loss grounded in negligence are dismissed, with leave to amend within twenty (20) days in conformance with this opinion, against the following plaintiffs: Ejay, Dembowski, Grandy, Crumlish, Allen, Regent Shoes, Vinciguerra, Corcoran, Royal Bank and Atlee. Claims for punitive damages are dismissed against the following defendants: Griffin, Balis and ABM. Plaintiffs' request for attorneys' fees is dismissed, without prejudice. All references to the firefighters who died in the fire and statements made by public officials and press reports are stricken from the Complaint. The motions to dismiss filed by defendants before the Complaint was filed (Docket numbers 5, 9, 12, 30) are denied as moot.

An order follows.

### ORDER

AND NOW, this 14th day of April, 1993, upon consideration of Defendants' Motions to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6), Motions to Strike pursuant to Fed.R.Civ.P. 12(f), and Motions for a More Definite Statement pursuant to Fed.R.Civ.P. 12(e), it is ORDERED THAT the motions are GRANTED IN PART and DENIED IN PART, as set forth primarily in V. Conclusion of the accompanying memorandum.

IT IS SO ORDERED.